Filed 8/29/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>STEVEN FORCE,<br><br>    Defendant and Appellant. | G055482<br><br>(Super. Ct. No. M90013)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Steven D. Bromberg, Judge. Reversed and remanded.

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Robin Urbanski, Deputy Attorney General, for Plaintiff and Respondent.

Our criminal justice system has only one absolute requirement: the accused must receive a fair trial. As this case demonstrates, prosecutors' understanding of their burden to provide such a trial is more important than their understanding of the burden of proof. And more demanding.

Judges and juries bear the responsibility of identifying what justice requires. They must decide, through their verdicts and judgments, the outcome of the trial. The prosecutor's job is to provide them the platform for their decisions by presenting the evidence against the defendant clearly and fairly.

That's it. When you get right down to it, that's the whole job of the trial prosecutor: Provide a fair trial.

Enforcing the law, protecting the public, supporting crime victims, any phraseology you choose for other aspects of criminal prosecution are subsets of that one job. It's not about convictions, it's not about courtroom mastery, it's not about prison sentences. And it's certainly not about won/lost records. It's about fair trials. Fairness is the sine qua non of the criminal justice system, and no amount of technical brilliance or advocative skill can make up for a failure to provide it.

The National District Attorneys Association phrases it somewhat differently, adding appropriate eloquence, but the focus is – significantly – aspirational; the goal of the prosecutor is phrased not in terms of *obtaining* convictions but of *seeking* justice: "The primary responsibility of a prosecutor is to seek justice, which can only be achieved by the representation and presentation of the truth." (Nat. Dist. Attys. Assn., National Prosecution Standards (3d. ed. 2009), § 1-1.1.)

Human systems are not capable of perfection, so we cannot guarantee the criminal defendant justice, although we seek it in every case. But we can – and have – promised fairness. And the prosecutor's job is to fulfill that promise.

A prosecutor who gives the defendant a fair trial has completed that task, no matter the outcome. Successful prosecution is defined not by the result, but by the process.

That's not to say it's an easy job. It is not. It is suited only to people who are capable of handling exceptional stress, complicated legal issues, and difficult judgment calls. We are fortunate in this state that our legal history has been informed and shaped by ethical and honorable prosecutorial agencies.

But we still encounter cases where a prosecutor has lost sight of the one paramount goal: fairness. That's a failure. Acquittals are not failures. Unfair trials are.

This is such a case. The prosecutor here took his eyes off the prize just long enough to commit misconduct in a way that requires reversal. We publish that reversal not to pillory him, but as a reminder of the unrelenting vigilance and ethical clarity required daily of prosecutors if they are to fulfill our nation's promise of a fair trial.

Appellant Steven Force is a sexually violent predator (SVP; Welf. & Inst. Code, § 6600, subd. (a)(1)) who is currently receiving treatment at a state mental hospital for pedophilia and exhibitionism. He challenges the trial court's order denying his petition to be placed in the conditional release program known as CONREP.[1] According to appellant, he was denied a fair trial because the prosecutor interfered with his right to testify, and the trial court erroneously refused to admit his release plan into evidence. We agree with both contentions. Accordingly, we reverse the trial court's order and remand the matter for a new trial.

---

[1] More specifically, Liberty CONREP, a private firm that contracts with the state to supervise SVP's who have been released from Coalinga State Hospital. Liberty's program includes daily monitoring with GPS technology, drug testing, polygraph assessments, weekly treatment, and job and housing assistance.

3

FACTS

Having been sexually abused as a child, appellant began committing sex crimes himself when he was a teenager.  In 1980, at the age of 21, he exposed himself to a girl on a playground and pressed his erect penis against her buttocks.  When the girl tried to get away, he grabbed her arm and made her touch his penis.  This resulted in his commitment to Patton State Hospital, where he was treated as a mentally disordered sex offender for two years.  In 1985, a few years after he was released, he forced an eight-year-old girl to orally copulate him in an elevator.  He served three years in prison for that offense.  After he was paroled, he got married in the hope of turning his life around, but ended up molesting his wife's young relatives and found himself sentenced to 20 years in prison.

Appellant served half of that term before being transferred to Coalinga State Hospital, where he was committed as an SVP.  In 2010, he exposed himself to a nurse at Coalinga, and in 2015, his petition for conditional release was denied.  He filed the present petition for conditional release two years later, in 2017.

At trial on the petition, appellant waived his right to a jury.  He did not dispute he has a sexual disorder and has committed the predicate offenses to satisfy the first two criteria for his continued commitment at Coalinga.  Thus, the only issue before the court was whether appellant could be placed in CONREP without jeopardizing public safety; more precisely, whether there was a serious and well-founded risk he would commit a sexually predatory offense if placed under the supervision of CONREP.  (See Welf. & Inst. Code, § 6608, subd. (g); *People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 922.)

There was conflicting testimony on that issue.  Dr. Hy Malinek, a clinical and forensic psychologist, testified appellant was ready for CONREP, even though he had only participated in Coalinga's sex offender treatment program (SOTP) for two years.  That program has four modules: 1) treatment readiness, 2) skills training, 3) skills

4

application and 4) community integration, which starts with CONREP. Appellant completed the first two modules but was rejected for advancement to module three because the review panel felt he had yet to fully process his prior offenses and because, by his own admission, he was still having "fleeting thoughts" about sex with children.

Despite this setback, Dr. Malinek believed appellant was doing very well in treatment. He noted that, in addition to participating in the SOTP at Coalinga, appellant had taken a number of ancillary classes to help him cope with his sexual disorders. In Dr. Malinek's opinion, these classes have enabled appellant to improve his empathy, problem solving and impulse control. He acknowledged appellant still needs work in these areas, especially since he scored in the high-risk group on the Static-99R recidivism test. However, Dr. Malinek found it significant that appellant has been well behaved – a "model patient" by most accounts – since he exposed himself to the nurse in 2010. All things considered, Dr. Malinek felt appellant could be safely maintained at CONREP.

Dr. Jeannie Brown, a psychologist who has been involved in appellant's SOTP, shared this view. She felt appellant would do well in CONREP because he has meaningfully applied himself in the SOTP at Coalinga, and CONREP is a highly-structured program that has proven very effective for its patients. Indeed, the evidence was undisputed that no one has ever reoffended in a sexually violent manner while they were in the program.

Nevertheless, the director of CONREP and three other psychologists who evaluated appellant did not consider him a suitable candidate for conditional release. These witnesses expressed concern about appellant's high score on the Static-99R and his inability to advance to module three in the SOTP. They were also troubled by the fact appellant has minimized his sexual history at times, has admitted committing numerous sex crimes that were never reported (mostly of a voyeuristic nature), and has conceded he was at risk of reoffending if he did not monitor his emotions closely.

5

In ruling on appellant's petition, the trial judge recognized appellant had made excellent progress in the two SOTP modules he had completed thus far. But the judge felt appellant had not yet progressed to the point where he could be safely released into CONREP. In that regard, the judge made it clear appellant's failure to make it into module three of the SOTP was a concern for him. "From what I'm gathering," he said, "people are in these modules for an extended period of time, years, before they're released. And there seems to be a good reason for it. These are stepping stones. And the good news is California has all of that available." "I have a sense that once [appellant is] in mod three, if he gets there, for some time it may change things around for him." However, at this time, "it's too early. He's not ready yet." Therefore, the judge denied his petition for conditional release.

## DISCUSSION

### *Prosecutorial Misconduct*

Appellant challenges the fairness of his hearing. He contends the prosecutor impermissibly infringed his constitutional right to testify by raising the prospect of perjury with his attorney before trial. The point is well taken.

The perjury issue stems from appellant's statements about his prior sexual misconduct, particularly the 1985 offense in which he forced a girl to orally copulate him, and the 2010 incident in which he exposed himself to a nurse at Coalinga. At appellant's previous SVP trial in 2015, while under oath, he denied committing those acts. However, he subsequently admitted them as he progressed through treatment. Those admissions came in 2016, after appellant failed a polygraph test relating to his prior sexual misconduct.

On the eve of trial in the present case, defense counsel informed the court appellant wanted to testify, and his testimony would include admissions about those instances of sexual misconduct in 1985 and 2010. However, defense counsel was worried the prosecutor would retaliate by charging appellant with perjury. In fact, she

6

told the court the prosecutor had already indicated to her that he "would charge" appellant with perjury if he testified inconsistently with his prior testimony denying those incidents.

This allegation concerned the trial judge. He told the prosecutor, "You can't do that. There is a case that says you can't." The prosecutor insisted, "I never said that." "What I said is [appellant] *could be* charged with perjury because he admittedly lied" in his prior testimony. (Italics added.)

The attorneys then took turns describing their recollection of what the prosecutor said on that topic. According to defense counsel, the prosecutor told her, "'I hope [appellant] testifies because I could charge him with perjury.'" However, the prosecutor denied saying that, too. He said he told defense counsel, "'It would be great if [appellant] testified because then *theoretically* he could be charged with perjury.'" (Italics added.) In regard to that statement, the prosecutor told the judge he was talking about the perjury issue "conceptually," and "[t]here was no personal threat" to actually charge appellant with perjury. The prosecutor said, "I asked the question to [defense counsel], like 'couldn't he be charged with perjury? Why would you put him in a position where that could happen?'"

The judge said if the prosecutor merely stated appellant "could" be charged with perjury, that might be okay. However, if he told defense counsel appellant "would" be charged with perjury, the prosecutor would be in "big trouble" and "might be working in a flower shop next week." Defense counsel conceded the prosecutor never said in so many words, "If [appellant] testifie[s] I will charge him [with perjury]." She also recognized that even if the prosecutor had not raised the issue with her, she probably would have had to advise appellant of the possibility of perjury. However, she felt perjury charges would be particularly inappropriate in this case because appellant's admissions about his prior sexual misconduct were important in terms of facilitating his progress in treatment. That's why she was so alarmed by the prosecutor's comments.

7

She said the issue really hit her when she saw appellant was on the prosecution's witness list.  She said, "I didn't anticipate [the prosecutor] would call my client after hinting that he could be charged with perjury."  When the judge asked the prosecutor if he was actually going to call appellant as a witness at trial, he responded, "I have to see how they put their case on first to see whether [his testimony would be] pertinent or not."

The judge then asked the prosecutor if he intended to charge appellant with perjury if he testified inconsistently with his prior testimony, and he said no.  However, based on the way the prosecutor answered the question, the judge got the impression the prosecutor was suggesting that while he *personally* would not charge appellant with perjury, *someone else* in the district attorney's office might do so.  The judge warned the prosecutor against that prospect, advising him not to "play games" with the perjury issue.  The prosecutor insisted that was not his intention.  Although he admitted he was not thoroughly versed in the case law on the issue, he said he knew it is improper for a prosecutor to threaten a prospective defense witness with perjury.

The conversation turned to the issue of immunity.  Defense counsel argued that if the prosecutor really had no intention of charging appellant with perjury, then the court should grant appellant immunity for it.  The judge thought that was a good idea in theory.  However, he felt he lacked the authority to grant immunity on his own.  When the prosecutor was unwilling to offer immunity to appellant, the prospect was forgotten.

Instead, the judge sought more information about what the prosecutor said to defense counsel regarding the prospect of appellant testifying at trial.  The prosecutor said he questioned the wisdom of counsel's decision to file a petition for conditional release at this time because she would have to call appellant as a witness to meet her burden of proof.  By his reckoning, that was tactically unsound because appellant's testimony would likely conflict with his prior testimony, raising the prospect of perjury.  However, if defense counsel waited a couple of years to file the petition, until appellant

8

was 60 years old, his Static-99R score would go down, there would likely be more institutional support for his conditional release, and he would not have to risk committing perjury by taking the stand. In other words, the prosecutor said, he was simply questioning the timing of the petition from a tactical perspective.

Following a break in the proceedings, the judge, obviously concerned by it, asked the prosecutor to explain more precisely what he had said to defense counsel. The prosecutor replied, "I can't state verbatim what I said. This was an offhand conversation we had informally months ago. But . . . I'm very comfortable saying I never threatened anything. I was making more of an inquiry on the line of reasoning that 'if you have the burden, and from my perspective your client would have to get on [the stand], aren't you worried about [the] potentiality [of perjury]?'" The prosecutor did not recall having any more conversations with defense counsel about the issue.

However, defense counsel said the issue of perjury came up more than once. She recalled the prosecutor telling her on more than one occasion, "I don't know how you make your burden without your client taking the stand. And wouldn't he be charged with perjury?" Defense counsel told the judge she took that to mean appellant *would be* charged with perjury if he decided to testify. She also related that she asked the prosecutor, "'So . . . if [appellant] testifies you're going to charge him with perjury?'" and he would not answer.

Asked to respond to this claim, the prosecutor said, "I don't remember that. And I think I would remember it." As for the rest of the allegations, the prosecutor said, "I don't remember specifics, Your Honor. . . . I remember one conversation, but it was many months ago. So if there was a second, I'm not going to challenge that. I just don't recall it." But the prosecutor did remember telling defense counsel at some point that "there is no right to perjure yourself. You don't have a right to make statements that are knowingly false, and then later on say, 'I want to testify and not have that come back to haunt me.'" The prosecutor told the judge he did not see that as a threat; he was simply

9

asking defense counsel why she would want to file a petition for conditional release at a time when perjury could be an issue.

In the end, the judge decided not to act on the prosecutor's statements. He strongly suggested it would be a good idea for the prosecutor to grant appellant immunity, which would make the entire intimidation issue go away. But no immunity offer was made, and appellant – after being informed by defense counsel what the prosecutor told her in regard to the perjury issue – decided not to testify at his trial.

The defendant in proceedings such as these has a constitutional right to present a defense, which includes calling witnesses in his favor and testifying on his own behalf.[2] (U.S. Const., amend. VI; *Rock v. Arkansas* (1987) 483 U.S. 44, 51; *People v. Lucas* (1995) 12 Cal.4th 415, 444.) Prosecutors must be sensitive to this right; they are not allowed to engage in conduct that undermines the willingness of a defense witness to take the stand. (*People v. Warren* (1984) 161 Cal.App.3d 961, 972.) Such conduct includes making statements to the effect that the witness would be prosecuted for any crime he or she committed in the course of testifying, such as perjury. (*In re Martin* (1987) 44 Cal.3d 1, 30 (*Martin*).)

That the prosecutor may have acted without culpable intent does not bear on the issue. In *Martin*, our Supreme Court made clear the prosecutor's intentions are irrelevant in determining whether a prosecutor has stepped over the line in this regard. To establish misconduct in the form of improper intimidation the defendant "need show only that [the prosecutor] engaged in activity that was wholly unnecessary to the proper performance of his duties and of such a character as 'to transform [a defense witness] from a willing witness to one who would refuse to testify . . . .' [Citations.]" (*Martin, supra*, 44 Cal.3d at p. 31; accord, *Webb v. Texas* (1972) 409 U.S. 95, 98 [due process

_____

[2] Though civil in nature, SVP proceedings are rooted in criminal convictions and therefore retain the due process rights associated with criminal trials. (*Reilly v. Superior Court* (2013) 57 Cal.4th 641, 648; *People v. Allen* (2008) 44 Cal.4th 843, 870.)

10

violation found where judge's admonition regarding the consequences of perjury effectively drove defense witness off the stand].) Bad faith is not part of the required showing.

In this case, there is no question the prosecutor's statements to defense counsel about the prospect of perjury were wholly unrelated to his duties. Coaching the defense is so outside a prosecutor's job description that we need spend little time on that analysis. Defense counsel was presumably aware of the perjury issue and well equipped to discuss it with appellant. There was no need for the prosecutor to raise the issue with her, even if he thought the timing of her petition questionable from a tactical perspective.

According to the prosecutor, he did nothing more than raise the perjury issue as a "theoretical possibility" in an attempt to understand why defense counsel filed the petition when she did. However, as we have noted, the timing of the petition was really none of the prosecutor's business. Moreover, he didn't just raise the issue of perjury as an abstract possibility, he specifically asked defense counsel if she was worried about *appellant* being charged with perjury. He also told defense counsel that no one has the right to avoid the consequences of making false statements at trial, which seems a thinly-veiled reference to appellant's prior testimony. If the prosecutor had simply made the point that such false testimony could be used to *impeach* appellant if he contradicted it in the present case, he would have been on solid ground; pointing out the weaknesses in an opponent's case is a legitimate approach to negotiation. But he prefaced his remarks by saying, "[T]here is no right to perjure yourself." Indeed, in every description given of what the prosecutor said, the word "perjury" was used in some form or another.

Furthermore, the prosecutor was unable to deny defense counsel's representation that he raised the perjury issue with her on more than one occasion. It's hard to see this as a "theoretical" or "conceptual" point, an interesting legal issue worth discussing over a beer. It appears to us that by repeatedly raising the prospect of perjury with defense counsel with a trial looming, the prosecutor was rather pointedly trying to

11

convince her to withdraw the petition and file it at another time. It is undisputed defense counsel was within her rights in filing the petition when she did, since it had been over a year since petitioner's previous petition for conditional release had been denied, (Welf. & Inst. Code, § 6608, subd. (j).) and the wisdom of defense counsel's strategy was not something he was called upon to evaluate.

One could argue that, despite what the prosecutor told defense counsel before trial, the perjury threat was not real because at the hearing on the issue the prosecutor told the court he was not going to charge appellant with perjury if he testified inconsistently with his prior testimony. However, the prosecutor's representation in that regard did not inspire a lot of confidence in the court, nor in us.

The trial judge concluded the prosecutor was telling him with "a wink and a nod" that he was not going to charge appellant with perjury, but "the guy next door" to him in the district attorney's office might very well to do so. The judge warned the prosecutor he would have dirty hands if that happened, and it would create "a big, big problem." And although the prosecutor told the judge he was not trying to "play games" with the perjury issue, the judge remarked, "Something is smelling here, and I don't like it. . . . It's getting very close to not passing the smell test."

To our minds, it failed. The prosecutor "has a special duty commensurate with a prosecutor's unique power, to assure that defendants receive fair trials." (*United States v. LaPage* (9th Cir. 2000) 231 F.3d 488, 492.) To that end, the American Bar Association standards governing prosecutorial conduct provide, "The prosecutor should know and follow the law and rules of the jurisdiction regarding victims and witnesses." He "should not act to intimidate or unduly influence any witness." And, he should not discuss the potential criminal liability of a witness in a manner that is likely to "intimidate the witness, to influence the truthfulness or completeness of the witness's testimony, or to change the witness's decision about whether to provide information."

(ABA Criminal Justice Standards for the Prosecution Function, Standards 3-3.4 (b), (c) & (g).) Repeated reminders of the applicability of the law of perjury to the defendant crosses that line and here had precisely the effect the ABA was concerned about.

Closer to home, the California District Attorneys Association's ethics manual advises prosecutors "must be careful to avoid witness intimidation problems," so as not to interfere with the defendant's right to present a defense. (CDAA (2016) Professionalism, A Sourcebook of Ethics and Civil Liability Principles for Prosecutors, Ch. VII, p. 17.) In that regard, the manual cautions, "Prosecutorial witness intimidation does not require threatening language, and it may occur even when the prosecutor's motives are impeccable." (*Ibid*.) It also states, "A prosecutor must never tell the attorney for a defense witness that the witness might be prosecuted based upon expected testimony." (*Ibid*.) And, it recommends any discussions regarding that possibility occur on the record in court, or be otherwise documented. (*Id*. at pp. 17, 20.)[3]

Unfortunately, it appears the prosecutor in this case did not fully appreciate all of the rules and ramifications surrounding his decision to raise the topic of perjury with defense counsel. Although he may have merely acted unwisely rather than with culpable intent, we cannot escape the conclusion that he impermissibly infringed appellant's constitutional right to testify on his own behalf. It's hard to imagine appellant being anything other than intimidated after his attorney told him what the prosecutor said to her privately on the topic of perjury and what he said at the hearing in which she challenged his remarks. Taken together, the prosecutor's statements signaled perjury charges were not out of the question if appellant testified inconsistently with his prior testimony, which is – according to his counsel – why he chose not to take the stand.

---

[3] The guidelines promulgated the ABA and CDAA are not binding authority on this court. However, as our courts have often recognized, they serve as a useful reference for evaluating the propriety of a prosecutor's conduct. (See, e.g., *County of Santa Clara v. Superior Court* (2010) 50 Cal.4th 35, 51; *People v. Hill* (1998) 17 Cal.4th 800, 832; *People v. Frank* (1985) 38 Cal.3d 711, 727, fn. 1; *People v. Bolton* (1979) 23 Cal.3d 208, 213; *People v. Hickey* (1980) 109 Cal.App.3d 426, 431, fn. 4.)

At any rate, the *Martin* case, *supra*, reminds us that the prosecutor's intent is not what we judge here; we need not gauge the prosecutor's credibility in explaining his conduct. The test is simply whether he "engaged in activity that was wholly unnecessary to the proper performance of his duties and of such a character as 'to transform [a defense witness] from a willing witness to one who would refuse to testify . . . .' [Citations.]" (*Martin, supra*, 44 Cal.3d at p. 31.) That, we think, is unquestionable.

In this regard, we find it telling respondent does not dispute appellant's claim the prosecutor's actions were a substantial cause of his decision not to testify. Nor does respondent dispute appellant's assertion his testimony would have been material and favorable to his case. (See *Martin, supra*, 44 Cal.3d at pp. 31-32.) Instead, respondent argues any infringement of appellant's right to testify was harmless beyond a reasonable doubt, an issue to which we now turn.[4]

Respondent's harmless error argument is straightforward. It is based on the trial court's stated concern that appellant had not made sufficient progress in treatment to warrant his release into CONREP. The court, as respondent notes, was distressed that appellant had yet to make it to module three of the SOTP. Given this, respondent argues there is nothing appellant could have said on the witness stand that would have convinced the court to grant his petition. We cannot agree.

It is obvious from the trial judge's ruling he did not consider this to be an open-and-shut case. After the conclusion of the lengthy evidentiary phase, the judge commended both parties on the presentation of their case and commented on how much he had learned about the SVP system from listening to the testimony. He had questioned the attorneys extensively during their closing arguments, invited them to submit

---

[4] The parties agree the harmless beyond a reasonable doubt standard applies in this case. (See *People v. Allen* (2008) 44 Cal.4th 843, 871 (*Allen*).) Under that standard, respondent has the burden "'to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" (*People v. Neal* (2003) 31 Cal.4th 63, 86.)

14

additional arguments via email (which they did), and taken the matter under submission for several days before issuing his ruling.[5]

In addition, the judge made it clear he considered defense expert Malinek to be the most compelling witness in the case. Dr. Malinek, like Dr. Brown, believed appellant had made sufficient progress in treatment to be safely released into CONREP. He did not believe it was necessary for appellant to enter module three of the SOTP before making this transition.

The trial judge explored that possibility at some length. At one point during closing argument, he observed it is possible for some students to skip a grade in school and still achieve success. Analogizing that situation to appellant's case, the judge wondered aloud why it would not be possible for appellant to bypass module three of the SOTP and enter CONREP directly from module two, especially since Dr. Malinek and Dr. Brown were on board with that. Although the prosecutor was dismissive of that idea, the judge held it open as a possibility, saying, "See, I don't know. . . . I'm not [ready to reject it] yet."

That's where appellant's testimony could have made a significant impact on the case. By explaining to the judge how dedicated he was to treatment, how positively it had affected him, and why he felt he could safely transition to CONREP, appellant might have been able to bridge the gap between the testimony of Drs. Malinek and Brown and the judge's apprehension. He might have been able to convince the judge he would not present a serious and well-founded risk to public safety while in CONREP, despite his lack of a module three pedigree. Or he might have performed badly and *made* this the open-and-shut case respondent considers it.

We recognize a person's dangerousness cannot be gleaned simply from hearing them testify in court. But our system puts great store in *viewing* witnesses; we've

---

[5] We have grown accustomed to reviewing the work of conscientious trial judges, but we still feel the hard work expended in this case deserves acknowledgement.

15

put it in our Constitution. If appellant had taken the witness stand, he could have addressed some of the concerns the judge had about his suitability for CONREP.  He could also have given the judge an opportunity to assess the level of his insight into his sexual disorders and to gauge his overall credibility.  If appellant had been able to make a credible presentation in these areas – as he had to two psychologists – there's no telling how the matter would have turned out.

Relying on *Allen, supra,* 44 Cal.4th 843, respondent contends no amount of testimony from appellant would have changed the outcome of the case.  In *Allen*, the Supreme Court found the improper exclusion of the defendant's testimony in an SVP trial harmless beyond a reasonable doubt because his proposed testimony – that his victims allegedly consented to or otherwise encouraged his sexual misdeeds – was related to irrelevant issues and uncharged acts that played a small part in the experts' opinions about his future dangerousness.  (*Id*. at pp. 872-875.)  However, the court also recognized "'it is only the most extraordinary of trials in which a denial of the defendant's right to testify can be said to be harmless beyond a reasonable doubt.  [Citation.]'  [Citation.]" (*Id*. at p. 872.)  That's because the most important witness for the defense is often the defendant himself.  (*Rock v. Arkansas, supra*, 483 U.S. at p. 52.)  As the Supreme Court put it, "A defendant's opportunity to conduct his own defense by calling witnesses is incomplete if he may not present himself as a witness." (*Ibid*.)

Unlike the defendant in *Allen*, appellant had no intention of denying or attempting to mitigate his history of sexual misconduct.  Indeed, we're in this briar patch because he was prepared to admit his prior misdeeds and take full responsibility for them. Although appellant's acknowledgment of his prior sexual misconduct is documented in his evaluation reports and was brought up during the trial, the judge did not have the opportunity to hear appellant speak to that issue under oath.  Thus, he did not have the chance to observe appellant's demeanor and sincerity in person.

16

We cannot say appellant would have obtained a more favorable result had he testified at trial. But that is not before us. The test is whether we are confident beyond a reasonable doubt that his testimony would have had no effect upon the judge's decision. We are not. Therefore, we cannot say the prosecutor's interference with appellant's right to testify was harmless.

*Exclusion of Appellant's Release Plan*

At trial, the court refused to admit appellant's release plan into evidence on the basis it was hearsay. Appellant contends this was error, and respondent makes no attempt to defend the court's decision. The only disputed issue is the extent to which the plan's exclusion prejudiced appellant. While we do not think the case was ever going to turn on the release plan, the court's error in excluding it could only have exacerbated the prejudice resulting from the infringement of appellant's right to testify, so neither was it entirely inconsequential.

Appellant's release plan consisted of a 26-page self-composed document entitled "Community Safety and Accountability Plan." At trial, the judge described the plan as the "I am the good guy" document, and the prosecutor said it contained "a dozen or more pages of exactly what [appellant] thinks and his opinions [about] why he thinks he is doing so well" in treatment. The prosecutor argued the plan constituted inadmissible hearsay because, having elected not to testify, appellant could not be cross-examined about its contents.

In response, defense counsel asserted appellant's unavailability was attributable to the prosecutor's perjury threats, an issue we discussed in the preceding section. She also maintained the report should be admitted because many of the witnesses alluded to it during their testimony, and they considered it in forming their

opinions about appellant's dangerousness.[6] Defense counsel insisted, "There is nothing [in the release plan] that the court doesn't already know." That caused the judge to ponder whether the plan was cumulative. However, he did not base his decision on that prospect. Instead, he tried to take a more pragmatic approach to the issue.

Since the case was not tried before a jury, the judge felt he had more leeway in terms of how to handle the release plan. He told the parties he was not going to admit the plan into evidence. But, he was going to "review and consider it" in order to "give [himself] an overview" and get "an idea of what [appellant] has said."

This was a confusing ruling. If the plan constituted inadmissible hearsay, the judge should not have considered it at all. (Evid. Code, § 1200.) However, not all hearsay is subject to exclusion at trial. As appellant correctly notes, hearsay statements that directly reflect the declarant's state of mind when the declarant's mindset is at issue in the case are admissible for their truth as an exception to the hearsay rule. (Evid. Code, § 1250, subds. (a)(1).) Witkin says hearsay statements "that do not directly declare a mental or emotional state, but are merely circumstantial evidence of it, are outside the hearsay rule" altogether. (1 Witkin, Cal. Evidence (5th ed. 2012) Hearsay, § 199, p. 1057.)

Appellant argues the contents of his release plan were admissible as direct evidence of his mental state, which was the central issue in the case, and respondent does not disagree. Respondent's only rejoinder to the argument is that the exclusion of the release plan amounted to harmless error because 1) the plan was discussed and relied on by various witnesses, 2) the judge ended up considering the plan, even though he ruled it was inadmissible; and 3) the plan had little bearing on appellant's dangerousness or the judge's decision to deny his petition.

---

[6] One witness described it as a "good plan" that improved appellant's prospects for a successful transition to CONREP, and another said the plan did not mean much because it had not been vetted by appellant's treatment team.

We agree with respondent that the prejudice resulting from the judge's wrongful exclusion of the release plan was mitigated by these three factors. But that's not to say appellant's case would not have been more persuasive had the judge admitted the plan into evidence and given it full consideration. If nothing else, the plan would have bolstered appellant's argument that, despite being rejected for advancement to module three of the SOTP, he could be housed safely at CONREP, which was the central issue in the case.

Standing alone, the court's decision to exclude the release plan would not be enough to warrant a reversal in this case. But, as we have explained, not only was the release plan improperly excluded, defendant was effectively driven away from the witness stand by virtue of the prosecutor's perjury comments. Having kept appellant from testifying through intimidation, the prosecution also succeeded in keeping a written version of his words out of evidence. Taken together, these two errors infringed appellant's fair trial rights to an intolerable degree; we cannot conclude their combined effect was harmless beyond a reasonable doubt.

The matter must be retried. Should appellant elect to testify on retrial, the trial court can take appropriate measures to ensure he is not punished for exercising his constitutional right to do so. (See *People v. Masters* (2016) 62 Cal.4th 1019, 1051-1052 [recognizing there may be circumstances under which the interests of fairness demand that a witness be granted immunity].)

## DISPOSITION

The trial court's order denying appellant's petition for conditional release is reversed and the matter is remanded for a new trial consistent with the views expressed herein.

BEDSWORTH, ACTING P. J.

WE CONCUR:

ARONSON, J.

THOMPSON, J.