FILED

02/02/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0042

DA 19-0042

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2021 MT 24

STATE OF MONTANA,

Plaintiff and Appellee,

v.

CLINTON SCOTT KRAUSE,

Defendant and Appellant.

APPEAL FROM:      District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. DDC 17-586
Honorable John W. Parker, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Chad Wright, Appellate Defender, Kristina L. Neal, Assistant Appellate
Defender, Helena, Montana

For Appellee:

Austin Knudsen, Montana Attorney General, Tammy K Plubell,
Assistant Attorney General, Helena, Montana

Joshua A. Racki, Cascade County Attorney, Jennifer L. Quick,
Deputy County Attorney, Great Falls, Montana

Submitted on Briefs:  December 9, 2020

Decided:  February 2, 2021

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Appellant, Clinton Scott Krause, appeals his conviction entered in the Eighth Judicial District Court, Cascade County. A jury convicted Krause of Driving Under the Influence of Alcohol (DUI), 4th or subsequent offense, after the District Court denied Krause's motion to dismiss and motion for mistrial. We affirm and address the following issues on appeal:

1. *Whether the District Court abused its discretion when it denied Krause's motion to dismiss for insufficient evidence.*

2. *Whether the District Court abused its discretion when it denied Krause's motion for mistrial.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 On September 27, 2017, at about 9:40 p.m., Officer Meek of the Great Falls Police Department was dispatched to the area of 6th Avenue South and Chowen Springs Loop in Great Falls, Montana, based on a report that there was a male slouched over the steering wheel of a vehicle. Officer Meek located a 2009 silver Nissan Ultima near the location dispatch provided. The location was west of the intersection of Chowen Springs Loop and 6th Avenue South near Parkdale. Parkdale is public housing that the Great Falls Housing Authority owns and rents to income-eligible members of the public.

¶3 When Officer Meek reached the vehicle, he observed a male sitting in the driver's seat of the vehicle, leaned back, with his head falling over his chest. The male was not moving and did not respond to Officer Meek shining a flashlight on his face. Officer Meek later identified the male as Krause. Officer Meek opened the car door and asked Krause if

2

he was okay. When he opened the door, Officer Meek smelled a strong odor of alcohol and observed that Krause's face and eyes were droopy and his eyes were watery. Officer Meek asked Krause where he had come from and Krause responded, "The Ho." Officer Meek confirmed that Krause meant the Hi-Ho Tavern on 26th Street South and 10th Avenue South in Great Falls. Krause's speech was heavily slurred, and the odor of alcohol was stronger when Krause spoke.

¶4 Officer Meek observed that the Nissan Ultima was a push-to-start vehicle, meaning it did not need a key in the ignition to start. Rather, for the vehicle to start, a key fob or "smart key" needed to be inside the car or within close proximity when the push starter was activated. Officer Meek asked Krause if he had a key to start the vehicle. Krause responded that he did not. Krause indicated that the key fob for the vehicle was in an apartment about 150 feet away. The vehicle was registered in Krause's name, and the address listed on the registration matched the Parkdale apartment 150 feet away. Officer Meek asked Krause to push the starter to verify it would not start. Krause lightly rubbed the ignition button twice, but Officer Meek could see that he was not actually pushing it. Officer Meek, again, requested that Krause push the ignition button. When Krause finally applied some force, the vehicle started. Officer Meek asked Krause to turn the vehicle back off and to step outside so he could investigate whether Krause was impaired. When Krause stepped out of the vehicle, the key fob was on the driver's seat. Officer Meek had Krause perform field sobriety tests. Krause displayed several indicators of impairment and was ultimately arrested for DUI. Officer Meek asked Krause to provide a blood sample to determine his blood alcohol content and Krause refused. Officer Meek obtained a search

3

warrant for a blood sample and took Krause to the hospital for the blood draw. Krause's blood alcohol content measured 0.162. Krause was subsequently charged with DUI, 4th or subsequent offense, in violation of § 61-8-401, MCA; Driving Without a Valid Driver's License, in violation of § 61-5-102, MCA; and Failure to Carry Proof of Liability Insurance, in violation of § 61-6-302, MCA. The matter proceeded to a jury trial.

¶5 At trial, Sarah Cole testified that, on the night in question, she was living at the apartment listed on the vehicle's registration. Cole and Krause have four children together, but Cole testified that Krause was not living with her on September 27, 2017. Cole maintained that Krause lived with his mother somewhere near Albertsons. Cole explained that she drove the Nissan Ultima but was not the registered owner of the vehicle. Cole said Krause bought the vehicle for her and their children and she was the only one who drove the vehicle. When Officer Meek found Krause, the vehicle was parked in a permitted parking spot near Cole's apartment. Cole had a sticker on the vehicle authorizing her to park in one of the parking spots at Parkdale, however, she was not assigned a specific parking spot. A sign is placed at the parking stall, which informs the public the parking stall is for tenants only and violators will be towed at their own expense. Anyone without a permit is not supposed to park in the parking spaces. Guests visiting Parkdale can park on the nearby street.

¶6 Cole testified that between 4:30 and 5:00 p.m. on the night in question, she was making dinner for her kids when Krause knocked on her apartment door. Krause was visibly intoxicated so she would not let him inside but told Krause he could go to the car and sleep it off because his residence was so far away. Cole maintained that she unlocked

4

the car with her key fob from inside her apartment, she saw the headlights flash, and watched Krause get into the car. Cole testified that Krause did not have a key fob for the car. She maintained, however, that she had two key fobs and would sometimes leave one in the car console. During Cole's direct examination, Cole stated that her car would not sound an alarm if she left a key fob in the car and that she had done so before. During Cole's cross-examination, the following exchange occurred between the prosecutor and Cole:

> Q. And you said that you could see the lights flash when you unlocked the car?
> A. Yes.
>
> Q. And you visibly observed that?
> A. Yes.
>
> Q. Okay. And so, that would mean that it would have been locked previously.
> A. Yes.
>
> Q. And so—can I see your fob?
> A. Yeah.
>
> Q. I don't need to touch it, I just want to look at it. And that's a Nissan Ultima?
> A. Yes.
>
> Q. Is that correct?
> A. Yes.
>
> Q. A 2009. Is that correct?
> A. Yes.
>
> Q. And you stated that you can leave a fob in the Nissan and still lock the vehicle?
> A. Yes.

5

Q. Okay. Do you understand what the penalties are for perjury?
A. Yes.

Q. Okay. And I'm just looking at Nissan's website and it says that the bonus—

¶7 Defense counsel objected on hearsay grounds. The District Court asked the State what its intention was, and the prosecutor responded she intended to use the Nissan website to impeach Cole regarding Cole's statement that she could lock the vehicle with a key fob while another key fob was inside the vehicle. The court asked the prosecutor the grounds for which the State was seeking to introduce the website information, and the prosecutor responded, "To show that she's given a materially false statement regarding the capabilities of a Nissan Ultima." The District Court excused the jury. Outside the presence of the jury, defense counsel questioned Cole, who maintained that she could leave one key fob in the car without the car sounding an alarm. She stated, "maybe it wasn't locking . . . [b]ut when you unlock it, it's always going to flash those lights whether it's locked or not." Cole stated she was willing to demonstrate this for the jury but explained that only one key fob was working. The court sustained defense counsel's objection and ruled that any questioning that referenced the Nissan website would be based upon inadmissible hearsay. When the jury returned, the following exchange occurred during cross-examination:

Q. Ms. Cole, regarding the key fob that was left in your vehicle and the key fob that you said you unlocked the car with from the house about 150 feet away, isn't it true that there's a lockout feature on your vehicle? Are you aware of that?
A. I was not aware that there was, no.

6

Cole stood by her testimony and stated that she would show the jury that her key fob would allow her to lock another key fob in the car, however only one of her key fobs was currently working.

¶8 Before closing arguments, defense counsel moved to dismiss the DUI charge for insufficient evidence, arguing that the State had failed to meet its burden of proving that Krause was on a "way of this state open to the public."[1] Defense Counsel argued the parking stalls were private parking spots for Parkdale residents only and not fitted for the public because a permit was required, and violators would be towed at the owner's expense. The court considered Krause's argument but specifically found that the parking stall was not "segregated by a gate or otherwise inaccessible from a physical standpoint." The court concluded that, based on jurisprudence established by this Court, the parking space in question was a "way of this state open to the public." The court denied the motion to dismiss.

¶9 Defense counsel also moved the court to declare a mistrial based on prosecutorial misconduct. Defense counsel described Cole's and the jury's reactions to the prosecutor's question to Cole about whether she understood the penalties of perjury: "I saw a reaction on Sarah Cole's face. It looked to me like she became a shrinking violet. And I also saw something of a reaction on the . . . jury's faces." Defense counsel argued the question regarding perjury was intended to, and did, intimidate Cole and the question went beyond

---

[1] Krause also moved to dismiss the charges of driving without a valid license or proof of insurance, arguing there was insufficient evidence that Krause had been driving. The court denied Krause's motion to dismiss. However, the jury acquitted Krause of these offenses.

legitimately attacking the credibility of a witness. Defense counsel further argued that the prosecutor knew the information from the Nissan website was inadmissible hearsay and, nevertheless, attempted to use the information to impeach Cole. The court acknowledged the prosecutor's line of questioning was "toward the outer edge of zealous advocacy," but nonetheless denied Krause's motion for mistrial. The court noted that a more proper manner for handling the line of questioning would have been to simply remind the witness that she was under oath. The court ordered the State to refrain from referencing any discussion of possible perjury in its closing argument.

¶10 The jury found Krause guilty of DUI and not guilty of Driving Without a Valid Driver's License and Failure to Carry Proof of Liability Insurance. The District Court sentenced Krause to the Department of Corrections for 13 months, with placement in the WATCH Program, followed by a suspended five-year commitment to the Department of Corrections. Krause timely appeals the District Court's denial of his motion to dismiss and denial of his motion for mistrial.

**STANDARDS OF REVIEW**

¶11 This Court reviews a district court's denial of a motion to dismiss for insufficient evidence de novo. *State v. Swann*, 2007 MT 126, ¶ 19, 337 Mont. 326, 160 P.3d 511. A district court's conclusion that a road, drive, or parking space is a "way of th[is] state open to the public" is a conclusion of law over which this Court exercises plenary review. *State v. Sirles*, 2010 MT 88, ¶ 15, 356 Mont. 133, 231 P.3d 1089. We review a district court's denial of a motion for mistrial for abuse of discretion. *State v. Pierce*, 2016 MT 308, ¶ 17, 385 Mont. 439, 384 P.3d 1042. This Court applies a deferential

8

standard to the district court because the trial judge is in the best position to decide on the motion. *Pierce*, ¶ 17. When considering a defendant's motion for mistrial, a district court must determine whether the defendant has been denied a fair and impartial trial. *State v. Partin*, 287 Mont. 12, 16, 951 P.2d 1002, 1004 (1997).

## DISCUSSION

¶12   *1. Whether the District Court abused its discretion when it denied Krause's motion to dismiss for insufficient evidence.*

¶13   To establish the offense of DUI, the State must prove beyond a reasonable doubt that the defendant, while under the influence of alcohol, drove or was in actual physical control of a vehicle "upon the ways of this state open to the public." *State v. Schwein*, 2000 MT, 371, ¶ 10, 303 Mont. 450, 16 P.3d 373 (quoting § 61-8-401(1)(a), MCA).  On appeal, Krause does not contest he was in actual physical control of the vehicle, nor does he contest he was under the influence of alcohol.  He argues, however, that the State failed to prove he was operating or controlling a vehicle "upon the ways of this state open to the public" because Officer Meek found him in a parking space that Krause maintains was intended only for Parkdale residents and required a permit.  We note, however, that Krause was neither a Parkdale resident nor the person to whom the permit was issued.

¶14   The Montana Legislature has provided that "ways of this state open to the public" means "any highway, road, alley, lane, parking area, or other public or private place adapted and fitted for public travel that is in common use by the public."  Section 61-8-101(1), MCA.  We examined this statute in *City of Billings v. Peete*, 224 Mont. 158, 729 P.2d 1268 (1986).  In *Peete*, we held that the parking garage of the

9

Northern Hotel in Billings was a "way of this state open to the public" within the statutory definition of § 61-8-101(1), MCA, notwithstanding that patrons could obtain access only via one ramp and only upon obtaining a ticket from a ticket booth attendant. *Peete*, 224 Mont. at 162, 729 P.2d at 1271. Upon exiting the parking garage, patrons were required to stop at the ticket booth, show the attendant his or her ticket, and pay the appropriate fee. *Peete*, 224 Mont. at 159, 729 P.2d at 1269. We concluded that the paved hotel parking garage was covered by §§ 61-8-101(1) and 61-8-401(1)(a), MCA, because the facility had a history of use by the public, the public was encouraged to use the facility, and the garage was fitted for public travel and in common use by the public. *Peete*, 224 Mont. at 162, 159, 729 P.2d at 1270-71.

¶15    In *Peete*, we discussed the legislative history of § 61-8-101(1), MCA, and two decisions of the Washington Supreme Court interpreting the Seattle city ordinance on which § 61-8-101(1), MCA was modeled. *See generally City of Seattle v. Wright*, 433 P.2d 906 (Wash. 1967); *City of Seattle v. Tolliver*, 641 P.2d 719 (Wash. 1982). In *Wright*, the Washington Supreme Court affirmed a trial court's determination that a private, paved thoroughfare was "adapted to and fitted for travel and was commonly used by the public . . ." and therefore fit within the city ordinance definition of "way open to the public." *Wright*, 433 P.2d at 909. The thoroughfare's surface was similar to nearby public thoroughfares and the owner made no travel restrictions except a sign, reading, "Private Thoroughfare – 10 m.p.h.," posted at one of the four entries onto the two-block road. The thoroughfare was regularly used by local residents and commercial vehicles for parking and accessing homes. *Wright*, 433 P.2d at 909. In *Tolliver*, the court held the

10

ordinance definition included a private parking lot located at a major intersection because of its easy access to adjoining streets and its history of use by bar patrons. *Tolliver*, 641 P.2d at 721.

¶16 Since *Peete*, this Court has interpreted that private roads and parking lots satisfy the statutory definition of "ways of this state open to the public" under § 61-8-101(1), MCA. We held the American Bank parking lot in Livingston was a "way of this state open to the public" because evidence demonstrated the lot, located in the middle of the active Livingston business district, was commonly used by members of the public patronizing nearby taverns. *Santee v. State, Dept. of Justice, Motor Vehicle Div.*, 267 Mont. 304, 310, 883 P.2d 829, 833 (1994). Despite the fact that the lot was accessible only by an alley and was posted with signs stating that it was private and that violators would be towed, this Court concluded that the parking lot was fitted for public travel and in common use by the public. *Santee*, 267 Mont. at 310, 883 P.2d at 833. We cited *Tolliver* as instructive. On similar grounds, we have held that an unpaved business parking lot with a rough, pothole-marked surface was a public way because the restaurant owned the parking lot, any member of the public who patronized the restaurant could park there, and members of the public have used the lot to sell flowers and Christmas trees, thus establishing common use by the public. *Hayes v. State*, 2005 MT 148, ¶¶ 7, 20-21, 327 Mont. 346, 114 P.3d 261. In *State v. Weis*, 285 Mont. 41, 945 P.2d 900 (1997), we held that a privately-owned, non-serviced, one-lane gravel roadway connecting three residences was a "way of this state open to the public" because it connected to a paved county road and members of the public who were lost, simply curious about the area, or had a purpose in visiting the residences

11

served by the lane, used the roadway. We noted that "whether the residents served by Boulder Lane consented to its use or not, the fact [was] that the lane, though private, [was] adapted and fitted for public travel and [was] in common use by the public." *Weis*, 285 Mont. at 45, 945 P.2d at 903 (citing § 61-8-101(1), MCA). The Court further held that "neither our statutes nor our interpretive case law require that a 'way of this state open to the public' be defined so narrowly as to include only those ways or places for travel which are legally dedicated to the public use." *Weis*, 285 Mont. at 43, 945 P.2d at 902. To that end, we determined the defendant in *Schwein* was on a "way of this state open to the public when he was found in a parked vehicle in a parking lot between Moose Breath Saloon and Magic City Welding in Billings, Montana. *Schwein*, ¶ 16. The defendant owned Magic City Welding and contended that he was parked in front of his own business in a parking space that he leased. Although the parking lot included privately leased spaces, akin to the parking garage in *Peete,* we concluded it was adapted and fitted for public travel and was in common use by the public and customers of adjoining businesses. *Schwein*, ¶ 14. The District Court relied on *Peete* and *Weis* when it denied Krause's motion to dismiss.

¶17 Krause argues these cases are distinguishable because each of the structures, roadways, and parking lots obviously fit within the statutory definition of "adapted" or "fitted" for public travel and each had a history of public use and encouraged ongoing public use. In contrast, Krause argues the parking space in question was a singular, private parking space with no history of public use and was not intended for public use. Krause contends that, unlike our prior cases, the facts here involve an active attempt by a private

12

property owner to keep the general public off its property, as evidenced by the Great Falls Housing Authority posting the stall as private and warning that violators would be towed. He maintains that the parking spot was no different than a private garage or a private driveway because Cole's private parking stall was not developed for widespread use, the public was not encouraged to use the parking stall and its spaces, and only tenants could park in the designated spaces.

¶18 We first address that in both *Peete* and *Schwein*, the facts involved privately leased parking spots in privately owned parking lots. Here, Krause argues Cole's parking space was no different than a private garage or driveway, even though Cole testified that she did not have a designated parking spot. Rather, she could park in any of the spots designated for Parkdale tenant parking. Regardless, whether the space was private is not dispositive. As evidenced by prior cases, a parking garage, lot, or space designated "private" does not foreclose the conclusion that a space is "adapted and fitted" for public travel or that it is "in common use by the public." The plain language of the statute defining a "way of this state open to the public" requires it be "adapted and fitted for public travel that is in common use by the public." We must, therefore, determine whether the parking space at issue is "adapted and fitted for public travel" and whether it is "in common use by the public."

¶19 We draw on our initial discussion and precedent established in *Peete* to answer this question. *Peete* adopted the rationale of the Washington Supreme Court's decision in *Wright*, which held that a place was "adapted and fit for public travel and in common use by the public" when: (1) the thoroughfare was similar in surface to nearby public

13

thoroughfares; (2) the owner made no travel restrictions except a sign which read "Private Thoroughfare – 10 m.p.h.", posted at one of the four entries onto the thoroughfare; (3) the thoroughfare was regularly used by local residents; and (4) commercial vehicles could park and access the homes. These facts are identical to the facts present here. Additionally, *Peete* drew on *Tolliver*, wherein the Washington Supreme Court concluded that the location of the parking place near an intersection of public roads, which was easily accessible to adjoining public streets, supported that the thoroughfare was adapted to and fitted for travel and was commonly used by the public. *Tolliver*, 641 P.2d at 721-22. The same facts present in *Tolliver* are present here as well.

¶20     Here, the parking space where Krause was parked is directly next to Chowen Springs Loop, a public street, and that road's intersection with 6th Avenue South. The parking space in question is one of several near Chowen Springs Park, a public park. As such, it is easily and readily accessible to the public. Indeed, Parkdale is a public housing complex owned by the City, used by its residents, used by commercial vehicles for parking and accessing the homes, and visitors drive on public roadways to get there. As the District Court observed, nothing prevents the public from parking in the parking spaces designated for Parkdale residents other than a warning that their vehicles could be towed at their expense. Further, members of the public are free to visit Parkdale tenants or Chowen Springs Park and can come and go as they please. Although Krause was inside a vehicle that had a sticker authorizing the car to occupy a space designated as tenant parking, Krause was not a Parkdale tenant but was living with his mother somewhere near Albertsons. Thus, we conclude there was sufficient evidence for the jury to assess whether

14

the parking space at issue was adapted and fitted for public travel and in common use by the public. Though this space may not be legally dedicated to public use, our statutes nor our interpretive case law require such a narrow reading of "way of this state open to the public"; whether the thoroughfare is privately or publicly owned is not dispositive of the issue. *Weis*, 285 Mont. at 43, 945 P.2d at 902. When determining whether a roadway, parking area, or any private or public area is "adapted and fitted for public travel" and "in common use by the public," we will look to all of the surrounding circumstances in each case to determine whether it would be reasonable to expect a member of the public to be using the drive and thereby entitled to the protections afforded by the State's impaired driving laws. We find that to be the case here.

¶21 Here, there was legally sufficient evidence for the jury to conclude that Krause was in a vehicle "on a way of this state open to the public"; the parking place was accessed by public roads; there was nothing physically preventing the public from using the space or roads within the public housing complex; Krause was parked near a public park; Krause was outside public housing, located within the City of Great Falls; and Krause himself, a member of the public, was using the parking space. Viewing the evidence in the light most favorable to the prosecution, the District Court did not abuse its discretion when it denied Krause's motion to dismiss for insufficient evidence.

15

¶22   *2. Whether the District Court abused its discretion when it denied Krause's motion for mistrial.*

¶23   Krause argues that the District Court abused its discretion when it denied his motion to dismiss based on allegations of prosecutorial misconduct. Krause maintains the prosecutor committed misconduct when she asked Cole whether Cole understood the penalties of perjury, and again when the prosecutor attempted to impeach Cole with inadmissible hearsay from the Nissan website. Krause argues the cumulative effect of this misconduct deprived him of a fair and impartial trial as guaranteed by the Sixth Amendment of the United States Constitution and Article II, Section 24 of the Montana Constitution.

¶24   In denying Krause's motion for mistrial, the District Court relied on *State v. Arlington*, 265 Mont. 127, 875 P.2d 307 (1994) and *State v. Campbell*, 241 Mont. 323, 787 P.2d 329 (1990), but noted the absence of specific case authority addressing a perjury warning. Both *Arlington* and *Campbell* involved a prosecutor explicitly characterizing a witness as a "liar." In both cases, this Court reiterated its strong disapproval of characterizing a witness' testimony as lies or a witness as a liar. "It is highly improper for a prosecutor to comment about the credibility of the defendant or in any way, to invade the province of the jury." *Arlington*, 265 Mont. at 157, 875 P.2d at 325.

¶25   We employ a two-step process to review the trial court's denial of a motion for mistrial. *Pierce*, ¶ 24. First, the Court considers whether the prosecutor's conduct was improper; if so, we consider whether the improper conduct prejudiced the defendant's right to a fair trial. *Pierce*, ¶ 24. As such, a prosecutor's misconduct "may be grounds for

16

reversing a conviction and granting a new trial if the conduct deprives the defendant of a fair and impartial trial." *State v. French*, 2018 MT 289, ¶ 21, 393 Mont. 364, 431 P.3d 332 (citation omitted).

¶26 We have held that "[t]he prosecutor is the representative of the State at trial and must be held to a standard commensurate with his or her position." *State v. Lawrence*, 2016 MT 346, ¶ 20, 386 Mont. 86, 385 P.3d 968. Prosecutors should not bring to the attention of the jury matters that the prosecutor knows to be inadmissible, "whether by offering or displaying inadmissible evidence, asking legally objectionable questions, or making impermissible comments or arguments." American Bar Assoc. Standards for Criminal Justice, Prosecution Function Standards 3-6.6(d) (4th ed. 2017). "[T]he United States Supreme Court has rightly observed that a prosecutor's improper suggestions and assertions to a jury 'are apt to carry much weight against the accused when they should properly carry none.'" *Lawrence*, ¶ 20 (quoting *Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 633 (1935)).

¶27 Krause primarily relies upon four cases to demonstrate that the prosecutor's invocation of possible perjury during Cole's cross-examination constituted misconduct: *State v. Stringer*, 271 Mont. 367, 897 P.2d 1063 (1995); *People v. Force*, 251 Cal. Rptr. 3d 834 (Cal. Ct. App. 2019); *United States v. Vavages*, 151 F.3d 1185 (9th Cir. 1998); and *State v. Halley*, 637 N.E.2d 937 (Ohio Ct. App. 1994). We find the circumstances in *Stringer*, *Force*, and *Vavages* distinguishable. In *Stringer*, among other misconduct, the prosecutor explicitly characterized the alleged victims as liars during closing argument. *Stringer*, 271 Mont. at 379, 897 P.2d at 1070. *Force* and *Vavages*, in

17

the courts' estimations, both involved overt threats of a perjury charge if the defendant or the defendant's alibi witness testified. *Force*, 251 Cal. Rptr. at 846; *Vavages*, 151 F.3d at 1190-93. No such facts exist here. The circumstances in this case are more similar to those in *Halley*. In *Halley*, a jury convicted Halley of kidnapping, rape, robbery, and aggravated burglary. *Halley*, 637 N.E.2d at 938. At trial, Halley called his wife to testify that they were together on the evening of the crimes and then left Halley's apartment together the next morning. *Halley*, 637 N.E.2d at 939-40. During cross-examination, the prosecutor asked Halley's wife if anyone had explained the charge of perjury to her. Defense counsel objected. *Halley*, 637 N.E.2d at 940. After a side bar, Halley's wife testified that she understood the charge of perjury and the consequences of such a charge, but she stood by her testimony. *Halley*, 637 N.E.2d at 942. During the state's rebuttal case, it provided a witness who said that Halley's wife had told him she was willing to lie for Halley about his location on the night of the crimes. *Halley*, 637 N.E.2d at 940.

¶28 The Ohio Court of Appeals concluded that the trial court erred by not sustaining the defendant's objection to the prosecutor's query about perjury and should have issued a curative instruction. *Halley*, 637 N.E.2d at 942-43. The court stated that it is improper for a prosecutor to imply that the witness is a perjurer; "[s]uch statements function as backhanded impeachment as well as attempted witness intimidation and express the prosecutor's personal belief or opinion as to the credibility of the witness, which is improper." *Halley*, 637 N.E.2d at 942 (citations omitted). Such a warning should instead occur outside the presence of the jury. *Halley*, 637 N.E.2d at 942. The court explained, however, that a warning will constitute reversible error only when it reaches the level of

18

intimidation and interferes with the defendant's right to present witnesses. *Halley,* 637 N.E.2d at 942. Because the prosecutor's conduct had no effect on the alibi witness's testimony, the court concluded the error was not prejudicial. *Halley*, 637 N.E.2d at 942.

¶29 Krause argues the prosecutor's question to Cole about whether she understood the penalties of perjury improperly insinuated Cole was lying and was intended to intimidate Cole and mislead the jury. We disagree. The prosecutor's question did not reach the level of "intimidation" nor did it interfere with Krause's right to present witnesses. While the prosecution's perjury warning was "toward the outer edge of zealous advocacy," as the District Court noted, we do not believe counsel invaded the province of the jury by characterizing Cole as a liar. *Stringer*, 271 Mont. at 381, 897 P.2d at 1072 (holding "we will reverse a case where counsel invades the province of the jury by characterizing a party or a witness as a liar, or [her] testimony as lies."). Moreover, the District Court formally ordered the State not to reference any discussion of possible perjury in its closing argument. Even assuming these questions constituted misconduct, the prosecutor's question had no effect on Cole's testimony. *Halley*, 637 N.E.2d at 942. Even after the prosecutor rephrased the question, Cole stood by her testimony and maintained that she saw the headlights flash when she unlocked the vehicle for Krause.

¶30 Krause also argues that the prosecutor committed misconduct by attempting to impeach Cole with inadmissible hearsay. Krause relies upon *United State v. Sanchez*, 176 F.3d 1214 (9th Cir. 1999), to support his claim of prosecutorial misconduct sufficient to warrant a mistrial. There, Sanchez argued that the prosecutor committed misconduct

19

during his cross-examination of Sanchez by impeaching him with his wife's statement she made to the deputy marshals who investigated his criminal case. *Sanchez*, 176 F.3d at 1221-22. The prosecutor knew that he would not be able to call Sanchez's wife to establish what she had told the deputy marshals. During the questioning, the prosecutor himself disclosed what Sanchez's wife had told the marshals to impeach Sanchez on a specific point. Sanchez's wife's statement was hearsay. *Sanchez*, 176 F.3d at 1221-22. The Ninth Circuit rebuked the prosecutor and concluded the prosecutor's use of the defendant's wife's extrajudicial statement to impeach the defendant was misconduct. *Sanchez*, 176 F.3d at 1222. The Court explained that it is improper 'under the guise of artful cross-examination to tell the jury the substance of inadmissible evidence.'" *Sanchez*, 176 F.3d at 1222 (quoting *United States v. Hall*, 989 F.2d 711, 716 (4th Cir. 1993) ("Protections against the use of privileged and inadmissible evidence would be of little benefit if the prosecutor were allowed, under the guise of 'artful cross-examination' to tell the jury the substance of inadmissible evidence.")).

¶31    Here, the circumstances are distinguishable from those in *Sanchez*. When the prosecutor initially referenced the Nissan website, defense counsel immediately objected. The prosecutor did not disclose any information from the website to the jury. The District Court sustained the objection outside the presence of the jury as inadmissible hearsay and suggested the prosecutor reframe her question. The jury was called back into the courtroom and the prosecutor reframed the question. Unlike in *Sanchez*, the jury did not hear the substance of the inadmissible evidence. Because the prosecutor did not ask

20

the question containing inadmissible hearsay, we agree with the District Court that the prosecutor did not commit misconduct.

¶32 Finally, Krause maintains that the cumulative effect of the prosecutor's question and attempted reliance on inadmissible hearsay deprived him of a fair and impartial trial because Cole's testimony was essential to his defense and she was visibly affected by the prosecutor's line of questioning. But even assuming this line of questioning constituted misconduct, which we do not, Cole stood by her testimony. Thus, Krause's defense was not affected. Further, Cole's testimony was offered as a defense against the actual physical control element of the DUI—because she had control of the key fobs, there was no way for Krause to start the car. But this defense failed because Krause did start the car for Officer Meek and Officer Meek found a key fob on the driver's seat of the vehicle where Krause had been sitting. Whether the jury believed or disbelieved Cole did not prevent the jury from concluding that Krause was in actual physical control of a motor vehicle because it was undisputed that Krause had a key fob in the car and was able to start the vehicle. This satisfied the element of actual physical control, regardless of Cole's testimony about the key fob or Krause's intention to drive or not drive.

¶33 For the foregoing reasons, the District Court did not abuse its discretion in denying Krause's motion for a mistrial.

**CONCLUSION**

¶34 The District Court did not abuse its discretion in denying Krause's motion to dismiss. The District Court did not abuse its discretion in denying Krause's motion for mistrial.

¶35    Affirmed.

/S/ LAURIE McKINNON

We concur:

/S/ MIKE McGRATH
/S/ DIRK M. SANDEFUR
/S/ INGRID GUSTAFSON

Justice Beth Baker, dissenting.

¶36    I would reverse Krause's conviction on the face of the record presented. Though I have no argument with the Court's analysis of the DUI statutes and our precedent, the State simply failed to meet its burden of proving by competent evidence beyond a reasonable doubt all elements of the offense.

¶37    In de novo review of Krause's claim, we must determine whether "after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Polak*, 2018 MT 174, ¶ 34, 392 Mont. 90, 422 P.3d 112. "[T]he test is whether the facts and circumstances are of such a quality and quantity as to legally justify a jury in determining guilt beyond a reasonable doubt[.]" *Polak*, ¶ 38 (quoting *State v. Fitzpatrick*, 163 Mont. 220, 225, 516 P.2d 605, 609 (1973)).

¶38    In accordance with § 61-8-101(1), MCA, the District Court instructed the jury that the State must prove that Krause was in a place "adapted and fitted for public travel that is in common use by the public." The Court's summary of the record accurately portrays the

22

evidence showing, when reviewed in a light most favorable to the prosecution, that the parking lot in which Krause was found was adapted and fitted for public travel. It was adjacent to a public street, it was not barred by gates, and it was readily accessible to vehicles. Unlike other cases in which we have found other private places to be "ways of this state open to the public," however, there was zero evidence of "common use by the public"—a separate requirement of the statute. *See, e.g.*, *Santee*, 267 Mont. at 310, 883 P.2d at 833 (citing testimony that "the lot is commonly used by members of the public"); *Peete*, 224 Mont. at 162, 729 P.2d at 1270-71 (noting evidence that parking lot had "a history of use by the public [and] the public is encouraged to use the facility"); *Weis*, 285 Mont. at 45, 945 P.2d at 903 (citing evidence that members of the public used the roadway).

¶39    Sarah Cole testified that a person must have the requisite parking sticker visibly displayed in the windshield to use the lot; signs posted throughout the lot said, "tenant parking only," and warned violators that they would be "towed away at their own expense." Officer Meek showed no awareness of the lot's restrictions. The State offered no evidence that the lot had through access to another street, that members of the public drove through the lot or used it to access other businesses or a nearby park, or that the parking restrictions were not adhered to or enforced. That Krause was found in a vehicle there despite not residing in the apartment complex (Opinion, ¶ 20) does nothing to show common use by members of the public; he was in a properly marked vehicle that was parked legitimately in a designated space within the lot. Likewise, "whether it would be reasonable to expect a member of the public to be using the drive" (Opinion, ¶ 20) is not

23

what the statute requires. It demands proof that the road or parking area "is in common use by the public." Section 61-8-101(1), MCA. When the trial court allowed the case to go the jury, it too relied only on the lot being "a fairly public setting," commenting, "there has been no testimony that it's gated or that it's blocked." These comments misapprehended the statute, which requires no such proof. Speculation or "[b]are suspicion from which inferences can be drawn is insufficient for a finding of beyond a reasonable doubt." *Polak*, ¶ 38.

¶40 Without a shred of evidence that the parking lot was commonly used by the public, there was insufficient evidence to establish all elements of the charged DUI offense. If the evidence is legally insufficient, "the proper remedy is a judgment of acquittal." *Polak*, ¶ 35. Without reaching Krause's second contention, I would reverse and remand for entry of that judgment.

/S/ BETH BAKER

Justice James Jeremiah Shea joins in the Dissent of Justice Baker.

/S/ JAMES JEREMIAH SHEA