FILED

06/13/2023

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0471

DA 19-0471

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2023 MT 110

STATE OF MONTANA,

  Plaintiff and Appellee,

   v.

CARESSA JILL HARDY, a/k/a
GLENN LEE DIBLEY,

  Defendant and Appellant.

APPEAL FROM: District Court of the Fourth Judicial District,
       In and For the County of Missoula, Cause No. DC 2017-481
       Honorable James B. Wheelis, Presiding Judge

COUNSEL OF RECORD:

   For Appellant:

     Chad Wright, Appellate Defender, Tammy A. Hinderman, Assistant
     Attorney General, Helena, Montana

   For Appellee:

     Austin Knudsen, Montana Attorney General, Mardell Ployhar, Assistant
     Attorney General, Helena, Montana

     Kirsten H. Pabst, Missoula County Attorney, Brian Lowney, Deputy
     County Attorney, Missoula, Montana

        Submitted on Briefs: January 11, 2023

           Decided: June 13, 2023

Filed:

        _____
             Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1   Hardy appeals from his convictions for two homicides and two attempts to solicit a third homicide entered in the Fourth Judicial District Court, Missoula County.  We affirm.

¶2   We restate the issues on appeal as follows:

1.  *Did the State's use of jailhouse informants violate Hardy's right to counsel?*

2.  *Was the jury fully and fairly instructed on the applicable law pertaining to witness credibility?*

3.  *Did the District Court violate Hardy's rights to counsel and to present a defense when it prevented defense counsel from commenting on a missing prosecution witness during closing argument?*

4.  *Should this Court exercise plain error review to consider whether Hardy's allegations of prosecutorial misconduct and other trial errors deprived him of a fair trial?*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3   In August 2017, the State charged Hardy with two counts of deliberate homicide for the deaths of Thomas Korjack (Korjack) and Robert Orozco (Orozco) in 2013.

¶4   Hardy met Karen Jill Hardy (Karen) in California in the 1990s.  They quickly began a romantic relationship and moved in together.  During their relationship, they had a child together—Z.H.—who is autistic and nonverbal.  Hardy and Karen moved to Wyoming, where they met Korjack.  Korjack, who became estranged from his family after he spent a year in prison for tax fraud,[1] had a Ph.D in engineering and worked in the petroleum

---

[1] While being investigated by the Internal Revenue Service, Korjack researched how to forge documents and assume new identities and looked into living in a foreign country.

2

industry. Hardy, Karen, Korjack, and Z.H. moved in together and began living as a family. Hardy's and Karen's romantic relationship ended around 2010 after Hardy began to transition to a woman and legally changed his name from Glenn Dibley to Caressa Hardy.[2] Eventually Karen moved back in with Hardy and Korjack in Wyoming. There, she met Orozco through Hardy and instantly fell in love with him, eventually having a child with him, R.J. Orozco, Karen, Korjack, and Hardy began to live together, with Korjack financially supporting the household as an engineer for an oil company. The family members paid Korjack back by working for him: Karen was a stripper, Orozco helped Korjack with his business conducting home inspections, and Hardy completed the repairs identified during those inspections.

¶5 Around 2012, the household moved into a home Korjack purchased outside of Frenchtown, Montana. Korjack put Hardy's name on the deed to the home. However, the relationship between Hardy and Korjack began to change when Korjack discovered Hardy was in a relationship with a man. According to Karen, Korjack started withdrawing funds from his accounts and stowing valuables in a safe in the basement of the home so that she and Z.H. would not "have to worry if something happened." Korjack withdrew resources from Hardy, treated him differently, changed the combination to the basement safe, and the two began to have frequent fights. While Korjack allowed Hardy to continue living in the Frenchtown home, he eventually asked Hardy for the deed to the house because he

---

[2] The record does not disclose to what degree Hardy has transitioned, including whether Hardy's gender has been updated on any forms of identification or documents.

3

wanted to remove Hardy's name. Hardy told Karen he was afraid Korjack would leave him, or would kick him out of the home, and he and Z.H. would become homeless. At this time, Korjack, Orozco, and Karen began looking for another home in another state.

¶6 Around March 26, 2013, Hardy and Korjack argued about the house. Karen, Korjack, and Orozco took R.J. into the basement bedroom of the Frenchtown home to discuss getting the deed from Hardy and finding a new home. Hardy walked downstairs in a bathrobe, entered the room, and another argument ensued. According to Karen, Hardy said something like "[d]o you want war? Then I'll give you war," pulled a gun out of the pocket of his bathrobe and started shooting. Karen dove away with R.J. as Hardy shot into the room towards Korjack and Orozco. Hardy started kicking and punching Karen, only stopping when Karen begged Hardy not to hurt her or the children, to which Hardy responded that he would never hurt the children. Korjack's body laid near the door and Orozco's body was on the bed. Karen noticed blood on the ground, walls, and television, and that a window was broken.

¶7 Hardy took Karen upstairs, pulled his bed into the living room, and made Karen sleep on the couch. The next morning Hardy—armed—escorted Karen downstairs so she could collect her things. The bodies of Korjack and Orozco were still laying in the room, exactly where Karen had last seen them. For several days, Hardy forced Karen to sleep in the living room. He screwed the windows shut and put locks on the doors so they could not be opened. Hardy kept the gun around him, and Karen did not feel like she could leave. One morning she woke up and there was a bullet or a bullet casing on her pillow.

¶8 Karen testified that Hardy asked her to go on a night drive with him to move the bodies, but the drive never happened. Instead, Hardy began to burn items in a fire pit behind the house. The fire went on for a long time, all day and all night. Karen noticed bedsprings by the fire pit, and when she next returned to the basement, her bed and the bodies of Orozco and Korjack were gone and the broken window had been replaced. Karen heard power tools being used in the basement and when she saw the safe again, it had a hole and had been emptied.

¶9 Karen did not seek help, fearing Hardy would kill or hurt her and the kids. After Hardy's friend Lawrence McKinley (McKinley) visited the house around April, Karen and R.J. moved in with McKinley, while Z.H. stayed with Hardy. Karen later returned to Hardy's house after McKinley's home was burglarized. She feared returning but had nowhere else to go. When Hardy's sister visited the house, Karen secretly gave her a letter explaining some of what had happened, but the sister reported the letter to Hardy, angering Hardy. Eventually Hardy helped Karen and R.J. move into a woman's home in eastern Montana. Hardy and Karen stayed in contact by telephone, but never lived together again. For years, Karen chose not to report the homicides because she was afraid Z.H. would get shot.

¶10 Finally, in July 2016, Karen believed she had seen Hardy in town and became frightened, so she walked into the police station in Sidney, Montana and reported the homicides. After an investigation, Hardy was charged with two counts of deliberate homicide for the deaths of Korjack and Orozco which the State alleged occurred between

March 26 and April 1 of 2013.  Later, the State added two counts of solicitation to commit deliberate homicide after Hardy asked other inmates to kill Karen while he was incarcerated in the Missoula County Detention Facility (MCDF).

¶11    During Hardy's incarceration in the MCDF, four of his fellow inmates provided incriminating information on Hardy to law enforcement.  First, Hardy became cellmates with Anton Orth (Orth) in September of 2017.  At the end of September, Orth reached out to his defense attorney to "arrange negotiations" with the county attorney's office.  Orth wrote a letter to the Missoula County Attorney's Office explaining that he was Hardy's cellmate, that he had information on Hardy, and that this was his second attempt to share this information.  Detective Jared Cochran (Cochran), the lead detective on the homicide investigation, interviewed Orth on October 3, 2017, and November 17, 2017.  In the first interview, Orth told Detective Cochran that Hardy was initially hesitant to discuss his case.  Orth began to directly ask Hardy about the homicide charges, threw "shockers" out such as telling Hardy if he were to commit suicide, he should first reveal the location of the bodies so the families could get closure, baiting Hardy by challenging his statements, and pretending to be on Hardy's side.  Orth told Detective Cochran he believed Hardy, in time, would admit Korjack and Orozco were dead.  Orth told Detective Cochran he snooped through Hardy's belongings and took pages from Hardy's notebook, some of which he sent to his attorney.  Detective Cochran instructed Orth not to do that, saying "if it is his property I would tell you to leave his property alone," but did not provide any other instructions to Orth.  Detective Cochran also told Orth he was not promising Orth anything.  At the end

of the meeting, Detective Cochran arranged to meet a second time with Orth to allow Orth to go over all his notes from his conversations with Hardy because Orth had difficulty with remembering things. The next day, Orth mailed pages from Hardy's notebook to Detective Cochran, which Detective Cochran believed Orth had already taken before the first interview. When Orth later confronted Hardy about where Korjack and Orozco were, Hardy admitted he knew they were dead. During Orth's second interview, he told Detective Cochran that Hardy provided Orth the following information: Hardy overheard Karen and Korjack planning to move out of the Frenchtown house with Z.H., so Hardy intervened but did not kill Karen because she had R.J.; Hardy eventually let Karen leave the Frenchtown house because of R.J.; Hardy admitted he used his truck to move the bodies to the burn pit a few days after the murders; Hardy asked Orth if he knew anyone in another country who could send a note making it appear as if it were from Korjack; and Hardy offered to pay Orth to ensure Karen did not testify, but then told Orth he was kidding.

¶12    Hardy was later moved to another jail pod where he met inmate Bryan Palmer (Palmer). After Palmer asked to speak with law enforcement and requested leniency in exchange for providing information, Detective Cochran interviewed Palmer twice. During the second interview, Palmer told Detective Cochran that Hardy solicited him to kill Karen. In trial, Palmer testified that Hardy asked him to kill Karen, his ex-girlfriend who was the reason he was in jail, offering him $10,000 to shoot her in the head so she was unrecognizable. At trial, Detective Cochran testified that he ultimately informed Palmer's probation officer in Idaho that Palmer was cooperating.

7

¶13     From December 2017 to January 2018, Hardy shared a jail cell with Martin Hope (Hope).  After Hope sent notes of his conversations with Hardy to jail staff, Detective Cochran interviewed Hope on December 21, 2017.  Hope told Detective Cochran that he "stroked" Hardy into thinking he could trust Hope, attempting to get Hardy to confess to the homicides.  Hardy believed Hope, who was in jail on a federal hold, was a gang member who was knowledgeable about crime and would not betray an inmate.  Hope said Hardy's first question to him was whether Hope knew about luminol, which is used to find blood evidence.  Hope told Detective Cochran of his efforts to break Hardy down into confessing, including pretending to help Hardy fabricate a defense.  Hope also told Detective Cochran that Hardy was "paranoid about some blood that could be on a TV from the splatter" and was concerned about a bullet he was unable to find after the shootings.  Detective Cochran did not provide any instructions to Hope at the end of the interview, and Hope returned to his cell.

¶14     Hope then wrote a note explaining that he had new information, so Detective Cochran met with Hope for a second time on January 16, 2018.  Among other information, Detective Cochran learned from Hope during the second interview that: Hardy went to the basement on the day of the murders, pulled the gun out, asked if they wanted war, shot Korjack twice, then shot Orozco; Hardy used a .45 caliber gun; Hardy beat Karen up but did not kill her because she was Z.H.'s mother; Hardy left bullet casings on Karen's pillow; Hardy broke open a safe containing Korjack's valuables; when Hope asked Hardy if he burnt the bodies, Hardy said "[p]oof" and "[u]p in smoke," as if the bodies were burned

and went up in smoke; and Hardy was concerned about bone fragments in the burn pit. Hope also told Detective Cochran that Hardy kept the blood-splattered, box-style television in a storage room in the basement, but that he had cleaned the blood off it. Detective Cochran subsequently applied for a search warrant for a "cathode ray tube (CRT) large box style television" based on information learned from both interviews with Hope as well as interviews with other witnesses.

¶15 Detective Cochran learned from Orth that Hardy solicited another inmate, John Braunreiter (Braunreiter), to kill Karen. Braunreiter was incarcerated in the same jail pod as Hardy in October of 2017. Detective Cochran then interviewed Braunreiter with his attorney present, and Braunreiter confirmed Hardy solicited him to kill a witness.

¶16 Hardy moved to suppress evidence obtained from the four inmates and from the search warrants which were based in part on the information from those inmates. Relevant to this appeal, Hardy specifically challenged a 2018 search warrant authorizing seizure of a television splattered with blood,[3] a 2018 warrant authorizing a search of Hardy's Frenchtown home for human remains,[4] and Hardy's statements to jailhouse informants

---

[3] Detective Cochran applied for the 2018 search warrant a week after interviewing Hope for the second time. The application relied in part on Karen's report that blood had splattered on a large box-style television during the homicides, and in part on Hope's statements during his second interview that Hardy told him he had cleaned the blood off the box-style television and kept it in a storage room in the basement. Law enforcement seized two televisions pursuant to the warrant, one of which tested presumptively positive for blood. DNA from at least two individuals was recovered, one of which was highly likely to be Korjack's DNA.

[4] The 2018 warrant to search Hardy's Frenchtown property for human remains was based on information from Karen, Hope, and bone fragments discovered during a previous search indicating that more fragments could possibly be discovered. Additional human remains were discovered and seized pursuant to the warrant.

soliciting the murder of Karen. At the suppression hearing, Orth, Hope, Palmer, and the detectives who conducted the interviews, including Detective Cochran, testified. After the hearing, the District Court determined that the three inmates testified truthfully. The court found Detective Cochran explicitly told Orth and Hope that they were not being promised any benefits in exchange for information, and neither inmate expected any such benefit. Further, Detective Cochran did not suggest Orth and Hope could sift through Hardy's documents, although both had accessed Hardy's paperwork while celled with him. The court determined that the inmates did not learn any important information from Hardy's paperwork except for what Hardy permitted them to read. The court found Orth was motivated to inform on Hardy because he disapproved of Hardy's parenting of Z.H. and that Hope was motivated by a dislike of Hardy. As a result, the District Court concluded that Hardy's right to counsel was not violated and denied Hardy's motion to suppress.

¶17 After a nine-day trial, a jury convicted Hardy of two counts of deliberate homicide and two counts of solicitation to commit deliberate homicide. Hardy was sentenced to serve four concurrent sentences of life imprisonment, one for each count, at the Montana State Prison.

## STANDARD OF REVIEW

¶18 We review alleged violations of the constitutional right to counsel de novo. *State v. Zlahn*, 2014 MT 224, ¶ 13, 376 Mont. 245, 332 P.3d 247. We review a district court's denial of a motion to suppress to determine whether the court's findings are clearly

10

erroneous and whether those findings were applied correctly as a matter of law. *State v. Conley*, 2018 MT 83, ¶ 9, 391 Mont. 164, 415 P.3d 473.

¶19 We review jury instructions given by a district court for an abuse of discretion. *State v. Deveraux*, 2022 MT 130, ¶ 20, 409 Mont. 177, 512 P.3d 1198.

¶20 We review a trial court's interpretation of a rule of evidence, a statute, or a constitutional right de novo. *State v. James*, 2022 MT 177, ¶ 9, 410 Mont. 55, 517 P.3d 170.

## DISCUSSION

¶21 *1. Did the State's use of jailhouse informants violate Hardy's right to counsel?*

¶22 Hardy argues that the State's use of Orth and Hope—two of the jailhouse informants—violated his right to counsel by indirectly eliciting incriminating statements from Hardy in the absence of counsel. As a result, Hardy contends that their statements and the evidence discovered because of the information they provided should be suppressed.

¶23 A defendant has a constitutional right to counsel in all criminal prosecutions. U.S. Const. amend. VI; Mont. Const. art. II, § 24. The right to counsel attaches when a prosecution commences, "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *State v. Scheffer*, 2010 MT 73, ¶ 16, 355 Mont. 523, 230 P.3d 462. Once attached, the government has an "affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking this right." *Maine v. Moulton*, 474 U.S. 159, 176, 106 S. Ct. 477, 487 (1985). This obligation

11

bars the government from "deliberately elicit[ing]" a defendant's incriminating statements in the absence of counsel, including indirectly through jailhouse informants. *Massiah v. United States*, 377 U.S. 201, 206, 84 S. Ct. 1199, 1203 (1964); *United States v. Henry*, 447 U.S. 264, 270-71, 100 S. Ct. 2183, 2187 (1980). The central concern of this doctrine "is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation." *Kuhlmann v. Wilson*, 477 U.S. 436, 459, 106 S. Ct. 2616, 2630 (1986).

¶24 The United States Supreme Court addressed indirect violations of the Sixth Amendment in *Henry*, 447 U.S. at 274, 100 S. Ct. at 2189, holding the government's use of an informant violated the defendant's right to counsel. There, the FBI used a paid informant housed in the same cellblock as the defendant to obtain information from the defendant. The FBI agent told the informant to "be alert to any statements made by federal prisoners [including the defendant], but not to initiate any conversation with or question" the defendant about the charged crime, a bank robbery. *Henry*, 447 U.S. at 266, 100 S. Ct. at 2184-85. While conversing with the defendant, the informant learned information about the bank robbery. The informant testified at the defendant's trial, and the defendant was convicted. The Supreme Court reversed, holding that the information was obtained in violation of the defendant's right to counsel because the government "intentionally creat[ed] a situation likely to induce [the defendant] to make incriminating statements without the assistance of counsel." *Henry*, 447 U.S. at 274, 100 S. Ct. at 2189. The Supreme Court emphasized several factors, including that the informant was acting under instructions from the government and paid for his services, the informant was "ostensibly

no more than a fellow inmate" of the defendant, and the defendant was in custody and under indictment during the conversations with the informant. *Henry*, 447 U.S. at 270, 100 S. Ct. at 2187.

¶25 Regarding the government's arrangement with the informant, the Supreme Court stated that the paid informant "deliberately used his position to secure incriminating information from" the defendant without counsel present. *Henry*, 447 U.S. at 270, 100 S. Ct. at 2187. The government had paid the informant for over a year on a contingent-fee basis, incentivizing the informant to produce useful information. Further, the federal agent knew the informant could access the defendant and "engage him in conversations without arousing [the defendant's] suspicion." *Henry*, 447 U.S. at 270-71, 100 S. Ct. at 2187. The Supreme Court noted that even if it accepted the FBI agent's "statement that he did not intend" for the informant to "take affirmative steps to secure incriminating information," the agent "must have known that such propinquity likely would lead to that result." *Henry*, 447 U.S. at 270-71, 100 S. Ct. at 2187. And while the government argued that federal agents instructed the informant not to question the defendant, the informant's testimony demonstrated that he "was not a passive listener," but rather had conversations with the defendant which produced the incriminating information. *Henry*, 447 U.S. at 271, 100 S. Ct. at 2187.

¶26 With respect to the defendant's incarceration, the Supreme Court emphasized the "powerful psychological inducements to reach for aid when a person is in confinement." *Henry*, 447 U.S. at 274, 100 S. Ct. at 2188-89 (citing *Miranda v. Arizona*, 384 U.S. 436,

13

467, 86 S. Ct. 1602, 1624 (1966)). "[T]he mere fact of custody imposes pressures on the accused; confinement may bring into play subtle influences that will make him particularly susceptible to the ploys of undercover Government agents." *Henry*, 447 U.S. at 274, 100 S. Ct. at 2188-89. The Supreme Court noted that the paid informant's "conduct and apparent status as a person sharing a common plight" facilitated the incriminating conversations. *Henry*, 447 U.S. at 274, 100 S. Ct. at 2189. "Conversation stimulated in such circumstances may elicit information that an accused would not intentionally reveal to persons known to be Government agents." *Henry*, 447 U.S. at 273, 100 S. Ct. at 2188.

¶27 The Supreme Court next applied the deliberate elicitation standard in *Moulton*. There, the defendant's accomplice agreed to cooperate with law enforcement on condition that no further charges would be filed against him. *Moulton*, 474 U.S. at 163, 106 S. Ct. at 480. The government arranged for the informant to wear a wire while meeting with the defendant. At the meeting, the informant discussed the defendant's pending charges, repeatedly pressed the defendant for details of the crime, and encouraged the defendant to describe his plan to kill witnesses. *Moulton*, 474 U.S. at 164-65, 106 S. Ct. at 481. Because of the accomplice relationship between the defendant and informant, the informant's "engaging [of the defendant] in active conversation about their upcoming trial was certain to elicit" incriminating information. *Moulton*, 474 U.S. at 177 n.13, 106 S. Ct. at 487. Consequently, the informant's participation "in this conversation was 'the functional equivalent of interrogation.'" *Moulton*, 474 U.S. at 177 n.13, 106 S. Ct. at 487 (quoting *Henry*, 447 U.S. at 277, 100 S. Ct. at 2190 (Powell, J., concurring)). The Supreme Court

14

stated that the government's "knowing exploitation" of such an opportunity to confront the defendant without counsel present "is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity." *Moulton*, 474 U.S. at 176, 106 S. Ct. at 487. Accordingly, the Supreme Court held that the government's knowing circumvention of the defendant's right to counsel violated the Sixth Amendment. *Moulton*, 474 U.S. at 176, 106 S. Ct. at 487.

¶28 Finally, in *Kuhlmann*, the Supreme Court addressed the deliberate elicitation standard in the context of an informant who was placed in close proximity to the defendant but "made 'no effort to stimulate conversations about the crime charged.'" *Kuhlmann*, 477 U.S. at 456, 106 S. Ct. at 2628 (quoting *Henry*, 447 U.S. at 271 n.9, 100 S. Ct. at 2187). Under these circumstances, there was no violation of the defendant's Sixth Amendment right to counsel. *Kuhlmann*, 477 U.S. at 456, 106 S. Ct. at 2628. The Supreme Court noted that the officer instructed the informant to merely listen to the defendant, and the informant obeyed. The informant did not ask the defendant questions about the pending charges, but only listened to the defendant's unsolicited statements. *Kuhlmann*, 477 U.S. at 460-61, 106 S. Ct. at 2630-31. The Supreme Court noted that merely showing that "an informant, either through prior arrangement or voluntarily, reported [a defendant's] incriminating statements to the police," is insufficient to demonstrate a violation of the right to counsel. *Kuhlmann*, 477 U.S. at 459, 106 S. Ct. at 2630. Instead, a defendant must show "that the police and their informant took some action, beyond merely listening, that was designed

15

deliberately to elicit incriminating remarks." *Kuhlmann*, 477 U.S. at 459, 106 S. Ct. at 2630.

¶29 These decisions provide the Sixth Amendment deliberate elicitation standard. Here, for Hardy to show the jailhouse informants deliberately elicited incriminating information from him in violation of his right to counsel, he must demonstrate the informants were acting as State agents when they obtained the incriminating information, and that they deliberately elicited that information. *See Randolph v. California*, 380 F.3d 1133, 1144 (9th Cir. 2004). There is no dispute that Orth and Hope deliberately elicited information from Hardy after first meeting with Detective Cochran. Orth and Hope repeatedly asked Hardy direct questions about the homicides. Orth challenged Hardy's statements to get to the truth, and he admits he "was a little bit swindly because [he] was talking God and being his friend. . . ." Hope testified that to try and learn more information from Hardy, he pretended to help Hardy fabricate an alibi. The efforts of both Orth and Hope to elicit information from Hardy went far beyond merely "stimulat[ing] conversations about the crime charged." *Randolph*, 380 F.3d at 1144 (quoting *Henry*, 447 U.S. at 271 n.9, 100 S. Ct. at 2187).

¶30 The parties contest whether Orth and Hope acted as state agents. The State argues that it must either have entered into an express or implied agreement to provide an informant a benefit in exchange for informing or it must explicitly instruct an informant to obtain information from the defendant for the informant to transform into a state agent. The State contends that Hope and Orth did not become state agents after their first

16

interviews with Detective Cochran because there was neither an agreement to provide the informants a benefit nor did the state instruct the informants to elicit additional information from Hardy. Hardy argues that when Detective Cochran first met with each informant, he learned the informants had deliberately placed themselves into positions of trust with Hardy, were actively investigating him, and had the intent to continue eliciting information from him. Accordingly, by sending the informants back into their cells without even instructing them to stop questioning Hardy, the State knowingly exploited an opportunity to investigate Hardy surreptitiously.

¶31 This Court has not addressed when a jailhouse informant transforms into a government agent for purposes of the right to counsel. In determining whether an informant is a government agent, a court must consider all the facts and circumstances surrounding the relationship between the informant and the state. *See Henry*, 447 U.S. at 271, 100 S. Ct. at 2187 (holding a "combination of circumstances [was] sufficient to support" a finding of an agency relationship); *see also Randolph*, 380 F.3d at 1144; *Ayers v. Hudson*, 623 F.3d 301, 311-12 (6th Cir. 2010); *Depree v. Thomas*, 946 F.2d 784, 793-94 (11th Cir. 1991) ("There is, by necessity, no bright-line rule for determining whether an individual is a government agent. . . ."); *State v. Marshall*, 882 N.W.2d 68, 95 (Iowa 2016) (stating no "mechanical checklist . . . exists for determining whether an informant is an agent").

¶32 An express agreement to provide compensation or some benefit to an informant in exchange for information is evidence of an agency relationship, but it is not conclusive.

17

*See Henry*, 447 U.S. at 270-71, 100 S. Ct. at 2187; *Randolph*, 380 F.3d at 1144. In *Randolph*, the Ninth Circuit held a jailhouse informant acted as a state agent when he was placed back into the defendant's cell after meeting with law enforcement, even though the government did not expressly agree to compensate the informant. *Randolph*, 380 F.3d at 1144. The court recognized that whether there was an express agreement for compensation was relevant evidence for determining an informant's status, but not dispositive. Although the state told the informant not to expect any benefits for testifying, "it is not the government's intent or overt acts that are important; rather, it is the 'likely . . . result' of the government's acts." *Randolph*, 380 F.3d at 1144 (quoting *Henry*, 447 U.S. at 271, 100 S. Ct. at 2187). Analyzing "the relationship between the informant and the State, not the compensation the informant receives, . . . is the central and determinative issue." *Randolph*, 380 F.3d at 1144.

¶33 In *Randolph*, the informant and defendant were cellmates. Law enforcement became aware of the informant when he gave them a letter asking for leniency, which was interpreted as an offer to testify against the defendant. After the informant met with law enforcement several times, he relayed incriminating information learned from the defendant, including the defendant's confession to the charged murder. *Randolph*, 380 F.3d at 1139. Evidence showed the informant clearly hoped for leniency, and the state and the informant consciously decided to cooperate with one another. *Randolph*, 380 F.3d at 1144. Consequently, because the state placed the informant back in a cell with the defendant after indicating "his willingness to cooperate with the prosecution," the state

18

"'intentionally create[d] a situation likely to induce [the defendant] to make incriminating statements without counsel's assistance.'" *Randolph*, 380 F.3d at 1146 (quoting *United States v. Kimball*, 884 F.2d 1274, 1278 (9th Cir. 1989)). In these circumstances, the government took the risk that the informant might violate the Sixth Amendment by deliberately eliciting such information. *Randolph*, 380 F.3d at 1146.

¶34 However, the Ninth Circuit held no government agency relationship was created when there was neither an express agreement for compensation nor a hope for leniency. *Brooks v. Kincheloe*, 848 F.2d 940, 945 (9th Cir. 1988). In *Brooks*, the defendant and informant were cellmates. Detectives approached the informant, who refused to provide information without his attorney present. Promising nothing in return, the detectives sent the informant back to the shared cell and asked him to remember anything the defendant might say. *Brooks*, 848 F.2d at 943. A few days later, the informant relayed the defendant's incriminating disclosures. Subsequently, the informant was transferred to another jail and paid $100. *Brooks*, 848 F.2d at 942. The Ninth Circuit concluded that the state "did not intentionally create a situation likely to induce the defendant to make incriminating statements." *Brooks*, 848 F.2d at 945. Because the detectives did not ask the informant to elicit information from the defendant or promise to pay him for that information, no agency relationship was created. *Brooks*, 848 F.2d at 944-45. The Ninth Circuit explicitly distinguished the circumstances in *Randolph* from those in *Brooks*, noting that in *Randolph*, the informant became a state agent because the state "knew or should

19

have known that [the informant] believed that he would receive leniency if he elicited incriminating statements from" the defendant. *Randolph*, 380 F.3d at 1146.

¶35 Here, Detective Cochran made no promises to Orth and Hope in exchange for their information on Hardy. While Orth wrote in his first letter to the county attorney that he was interested in "negotiations," he testified that he used that word because it came from his attorney. Orth testified that he did not ask for anything for providing information on Hardy. Further, the District Court found both Orth and Hope were motivated by their dislike of Hardy. Orth testified that he became a witness because he disagreed with Hardy's treatment of his child and wanted to provide closure to the victim's families by locating the bodies. Hope testified that he told his attorney he was not seeking anything in return for his testimony and stated he was not "doing this for gain, for a time off of my sentence, nothing." Instead, Hope testified that he became a witness because he felt Hardy was remorseless for his actions and "for the families because [he knew] what [Hardy] admitted to [him]." As the District Court found, Orth and Hope were acting on their own initiative. An informant who acts on their own initiative, whether motivated by conscience or "an unencouraged hope to curry favor," does not necessarily transform into a state agent absent other circumstances showing their actions are attributable to the State. *Thomas v. Cox*, 708 F.2d 132, 135-36 (4th Cir. 1983); *see also Commonwealth v. Foxworth*, 40 N.E.3d 1003, 1011 (Mass. 2015).

¶36 Next, evidence that the state instructed an informant to gather information on a defendant may show an agency relationship. *See Henry*, 447 U.S. at 270, 100 S. Ct. at

20

2187 (concluding that "acting under instructions as a paid informant for the Government" was one important factor showing agency relationship); *Kuhlmann*, 477 U.S. at 460, 106 S. Ct. at 2630 (holding no agency relationship was created when the government instructed the informant not to question the defendant and the informant heeded that instruction); *Manns v. Texas*, 122 S.W.3d 171, 187 (Tex. Crim. App. 2003) (discussing cases finding instructions such as "keep your ears open" were insufficient to create agency relationship); *Brooks*, 848 F.2d at 945 ("[D]etectives did not request [the informant] to elicit any information from defendant[.]"); *McBeath v. Commonwealth*, 244 S.W.3d 22, 33 (Ky. 2007) (finding agency relationship when informant "was told to report back what was said in [the defendant's] exact words. This informed [the informant] that the police wanted more information about the crime and induced him to obtain that information[.]"). Here, Detective Cochran did not instruct the informants to gather information, to report back if they learned anything new, or even to keep their ears open. Although Detective Cochran ended the first meeting with Orth by arranging to meet a second time, he did so specifically so Orth could gather his notes to facilitate a more effective interview. Detective Cochran did not suggest he was interested in any new information gathered by Orth. In fact, Detective Cochran explicitly instructed Orth *not* to take any more of Hardy's personal property. Therefore, the informants were not expressly instructed or encouraged by the State to elicit information from Hardy at any point during their interviews.

¶37    Hardy argues that although the State did not instruct the informants to obtain information from him, the State knew the informants would likely do so after being

21

returned to their cells. By not explicitly discouraging the informants from interrogating Hardy, Hardy argues the State "knowing[ly] exploit[ed] . . . an opportunity to confront" him without the presence of counsel. *See Moulton*, 474 U.S. at 176, 106 S. Ct. at 487. Certainly, an agency relationship may be created when the State takes advantage of an informant's access and intent to deliberately elicit incriminating information from a defendant; however, it is generally insufficient on its own. Additional facts must be present demonstrating the informant's actions are attributable to the State. *See Henry*, 447 U.S. at 271, 100 S. Ct. at 2187. In *Henry*, the government told a paid informant to obtain information on the defendant, but explicitly instructed him not to question the defendant about the charged crime. The Supreme Court rejected the government's argument that it could not be held responsible for an informant's actions when it instructed the informant not to question the defendant, reasoning that the government "must have known" the informant was likely to do so regardless. *Henry*, 447 U.S. at 270, 100 S. Ct. at 2187. Because the informant was paid on a contingent-fee basis, he was highly motivated to elicit information from the defendant despite instructions to the contrary. *Henry*, 447 U.S. at 270-71, 100 S. Ct. at 2187. In *Moulton*, the Supreme Court similarly rejected the government's argument that instructing the informant to "not interrogate" the defendant was sufficient to prevent the formation of an agency relationship. *Moulton*, 474 U.S. at 177 n.14, 106 S. Ct. at 488. The Supreme Court noted that under the circumstances, these instructions "were necessarily inadequate." *Moulton*, 474 U.S. at 177 n.14, 106 S. Ct. at 488. Because the government arranged for the informant to wear a wire to a meeting

22

between the informant and defendant when it knew the only subject to be discussed at that meeting was the defendant's charges, "a Sixth Amendment violation was inevitable" regardless of how the government instructed the informant. *Moulton*, 474 U.S. at 176-77, 177 n.14, 106 S. Ct. at 488.

¶38 The circumstances under which Orth and Hope elicited information from Hardy are unlike those in *Henry* and *Moulton*. True, Detective Cochran knew—perhaps even hoped—the informants would deliberately elicit information from Hardy without counsel present and did not instruct the informants to stop the interrogations. Nevertheless, no additional facts demonstrate the informants' actions should be attributed to the State. Unlike *Henry*, no agreement or expectation about compensation incentivized the informants. Unlike *Moulton*, Hope and Orth were not wired; they were not certain to learn additional information from Hardy; and the State did not actively intervene to take advantage of the opportunity being cellmates with Hardy presented. Further, although Detective Cochran did not instruct the informants to stop interrogating Hardy, he also did not encourage that behavior. With Orth, Detective Cochran explicitly instructed him *not* to take any more of Hardy's personal property. Consequently, when the informants elicited information from Hardy after their first interviews, they did so entirely of their own accord without any explicit or implicit direction, encouragement, or intervention by the State.

¶39 In conclusion, no facts in the record demonstrate either Hope or Orth were acting as government agents when they elicited information from Hardy after meeting with the detectives. There is no evidence of any agreement, benefit, or instructions, or of any other

23

State actions which transformed the informants into State agents. Accordingly, Hardy's right to counsel was not violated.

¶40 *2. Was the jury fully and fairly instructed on the applicable law pertaining to witness credibility?*

¶41 At trial, the District Court provided a pattern witness credibility instruction and a pattern instruction on evaluating a defendant's confession or admission. Hardy proposed a specific instruction regarding the credibility of informant testimony, which stated:

> [Testimony of Informants]
>
> You heard testimony from inmates Anton Orth, Martin Hope, John Braunreiter, and/or Bryan Palmer. Their testimony was received in evidence and may be considered by you, but you should carefully scrutinize their testimony given and the circumstances under which each witness has testified, and every matter in evidence which tends to indicate whether the witness is worthy of belief. Consider each witness' intelligence, his motives, his access to secondary sources including the Defendant's paperwork, his state of mind, his demeanor and manner while on the witness stand. All evidence of a witness whose self-interest is shown from either benefits received, threats or promises made, or any attitude of the witness which might tend to prompt testimony either favorable or unfavorable to the accused should be considered with caution and weighed with care.

The State objected and argued the proposed instruction was "direct commentar[y] on the witnesses' testimony . . . that appear[s] to me to be geared to telling the jury to distrust a certain witness." Hardy responded that the informants were "not typical witness[es]" and that the proposed instruction "is routinely given in federal courts." Hardy added that the informants' access and review of his paperwork while incarcerated with him justified the additional cautionary instruction about analyzing their testimony. The District Court

24

acknowledged that the informants' "credibility is an issue," but refused Hardy's proposed instruction.

¶42 Hardy argues the District Court abused its discretion by refusing to give his proposed informant instruction. He asserts that the court should have instructed the jury to view the testimony of the jailhouse informants with greater caution than testimony from ordinary witnesses given the inherent unreliability of jailhouse informants. Hardy relies on *State v. Grimes*, where we held a cautionary instruction should be given "when a government informant motivated by personal gain rather than some independent law enforcement purpose provides testimony. . . ." *State v. Grimes*, 1999 MT 145, ¶ 45, 295 Mont. 22, 982 P.2d 1037. We determined the cautionary instruction was necessary in *Grimes* because an instruction to view the defendant's oral admissions and confessions with caution was insufficient on its own to adequately instruct the jury. *Grimes*, ¶¶ 43-45. Conversely, the State cites to *State v. DuBray*, 2003 MT 255, ¶ 92, 317 Mont. 377, 77 P.3d 247, where we held no cautionary instruction was required when an informant testifies because the general credibility instruction was sufficient.

¶43 This Court reviews jury instructions for an abuse of discretion. *Devereaux*, ¶ 20. We must determine whether, taken as a whole, the instructions fully and fairly instruct as to the applicable law. *Devereaux*, ¶ 20. "If the instructions are erroneous in some aspect, the mistake must prejudicially affect the defendant's substantial rights in order to constitute reversible error." *State v. Gerstner*, 2009 MT 303, ¶ 15, 353 Mont. 86, 219 P.3d 866. *See also Dubray*, ¶ 92 ("[T]o constitute reversible error, the district court's actions must affect

25

substantial rights of the party.") (citing *State v. Long*, 274 Mont. 228, 234, 907 P.2d 945, 948 (1995)). The question, thus, is whether the instruction "adequately addresses witness motive, bias or prejudice, and bad character for truthfulness." *Long*, 274 Mont. at 234, 907 P.2d at 949. "Where the proposed instruction is adequately covered by a given instruction, it is not error for the trial court to refuse the proposed instruction." *Long*, 274 Mont. at 234-35, 907 P.2d at 949.

¶44 Hardy's proposed instruction named the four informants and directed the jury to scrutinize their testimony in particular, taking into consideration specific factors, such as their "access to secondary sources including the Defendant's paperwork." However, instead of instructing the jury as to specific witnesses and facts, the District Court gave several pattern instructions on witness credibility. The jury was instructed to "carefully consider all the testimony given, the circumstances under which each witness has testified, and every matter in evidence that tends to indicate whether a witness is worthy of belief." The jury was further directed to consider:

1. The appearance of the witnesses on the stand, their manner of testifying, their apparent candor, their apparent fairness, their apparent intelligence, their knowledge and means of knowledge on the subject upon which they have testified.

2. Whether the witnesses have an interest in the outcome of the case or any motive, bias or prejudice.

3. The extent to which the witnesses are either supported or contradicted by other evidence in the case.

4. The capacity of the witnesses to perceive and communicate information.

5. Proof that the witness has a bad character for truthfulness.

26

Further, the jury was instructed on how to view Hardy's admissions and confessions, as follows:

> The circumstances under which the [admission or confession] was made may be considered in determining its credibility or weight. You are the exclusive judges as to whether an admission or a confession was made by the Defendant, and if so, whether such statement is true in whole or in part. If you should find that any such statement is entirely untrue, you must reject it. If you find it is true in part, you may consider that part which you find to be true.

> Evidence of an unrecorded oral admission or oral confession of the Defendant should be viewed with caution.

Accordingly, the jury was instructed to determine the credibility of each informant, including their knowledge, how they gained that knowledge, their self-interest, criminal records, the extent to which each witness was "supported or contradicted by other evidence," and to view testimony about Hardy's unrecorded confessions and admissions with caution. Therefore, the jury was specifically directed to subject critical portions of Hope's, Orth's, and Palmer's testimony to greater scrutiny.

¶45 Further, at trial each testifying informant was subjected to thorough cross-examination. Hardy questioned Orth, Hope, and Palmer extensively about their previous criminal charges, their interactions with each other while incarcerated, their motives for testifying against Hardy, and whether they sought, received, or expected a benefit for testifying. Palmer testified about his memory problems, mental health diagnoses, multiple felonies, and that he served as a confidential informant "a few" times.

27

Hope explained why he disclosed his cooperation to his federal defender and admitted he had "been dishonest" and a drug addict most of his life.

¶46     Hardy extensively questioned Orth about whether he asked for or received any benefits for testifying, the disposition of his criminal sentence and circumstances leading to that charge, his previous experience as an informant, and his brain injury and resulting memory problems.  Orth also admitted he had "a long history of drugs" and that given his brain injury, he was unsure how his drug use might impact his memory.  Hardy then asked Orth about his inconsistent testimony as to whether he overheard Hardy soliciting Braunreiter to kill Karen in the following exchange:

> Q: [Defense Counsel]: [D]o you recall your response when I asked you [at the suppression hearing] exactly what [Hardy] said to John Braunreiter?
>
> A: [Orth]: No.
>
> Q: You said you don't remember anything about that. . . .
>
> A: Well, it's really obvious that I have issues with my memory. That is exactly the reason that I wrote everything down. . . .  Now I remember. . . .
>
> Q: But in a previous hearing when you were under oath, you admitted that you could not remember any solicitations that the defendant made when he was talking to John Braunreiter.
>
> A: I am well aware of my deficient memory.
>
> Q: Why do you have such a poor memory?
>
> A: I have a brain injury.

Hardy also presented the testimony of another inmate, Curtis Alexander, who testified as to Orth's reputation in the jail for dishonesty, that Orth was "a known jailhouse snitch,"

28

and told the jury Orth was "probably testifying for personal gain."  Finally, Orth and Hope were repeatedly asked about their access to Hardy's paperwork, whether they ever looked at it without Hardy's permission, and how they learned inside information about Hardy's case and legal strategy.  When cross-examined about whether he ever looked at Hardy's paperwork without permission, Orth admitted "[y]eah.  He didn't exactly give me consent to it."

¶47    We conclude the jury was made aware of facts concerning the credibility of the jailhouse informants through thorough cross-examination and received instruction on how to consider those facts.  Further, the District Court specifically instructed the jury to view testimony about Hardy's admissions and confessions with caution.  The jury instructions, taken as a whole, fully and fairly instructed as to the applicable law.

¶48    *3. Did the District Court violate Hardy's rights to counsel and to present a defense when it prevented defense counsel from commenting on a missing prosecution witness during closing argument?*

¶49    The solicitation charge in Count III was based on Hardy soliciting another inmate—Braunreiter—to kill Karen.  The State planned to call Braunreiter to testify at trial.  However, before trial began, Braunreiter indicated he would be disruptive and noncooperative if called.  The State informed the District Court of Braunreiter's intent and asked that the court admonish Braunreiter about proper procedure before his testimony.  The District Court agreed, but warned counsel that the witness would likely ignore the admonishment.

¶50    In its opening, the State discussed Braunreiter's statements to law enforcement about the solicitation, stating:

> Law enforcement spoke to Braunreiter, who confirmed that [Hardy] spoke with him about killing Karen, saying that [Hardy] approached him and asked him if he would go after her for him.
>
> [Hardy] told Braunreiter that Karen needed to go away, and Braunreiter asked him for $10,000.00 up front and ten thousand after but said he needed to think about [Hardy]'s proposal. Braunreiter indicated he never did intend to kill Karen, but he was going to take [Hardy]'s money and use it to bond out of custody.
>
> [Hardy] discussed, with Braunreiter, how he would pay him. He said he had assets to liquidate and that he could . . . get the money to one of [Hardy]'s sisters.

Hardy also discussed Braunreiter during opening, stating:

> And then we have Mr. Braunreiter, who is the basis of count three. Frankly, we don't know what's going to happen when the state calls Mr. Braunreiter to the stand. He refused to participate in a court-ordered deposition. He refused to be put under oath or to tell the truth. He has now written letters indicating that he's not going to testify. . . . [T]hat everybody else was on meth, and he was on meth when he talked to detectives and told them what was happening.

The State ultimately chose not to call Braunreiter to testify.

¶51    Hardy indicated concern over Braunreiter's absence on multiple occasions. Hardy asked Detective Cochran on cross-examination if he knew why the State did not call Braunreiter. The court sustained the State's objection to the question. Hardy later raised the issue again while outside the presence of the jury, stating "that we can make a very good argument, in closing, that the state has not met its burden of proof on [Count III], in part because John Braunreiter did not testify." He asserted that under § 26-1-303, MCA,

30

he could argue the jury should view the evidence on Count III with mistrust because the State had the power to present stronger evidence by calling Braunreiter as a witness but chose not to. As a result, Hardy contended he could "argue that's a huge hole in their case, and they haven't met their burden by not calling the main witness that's the basis of" Count III. Hardy further stated he was only asking to be allowed to "touch on" Braunreiter's absence in closing, since "[t]he jury did not have the benefit of hearing from him, and that's something that they should consider." Hardy also had the following exchange with the District Court:

> [Defense Counsel]: Your Honor, [Braunreiter] is the basis of count three. He's the heart of that charge. . . .
>
> [The Court]: Well, he was the main, but there's other evidence that shows that. It's not as good or it's not what you would prefer if you're . . . trying it. But . . . the fact that they don't have it isn't necessarily attributable. It doesn't mean they didn't want to call him.
>
> [Defense Counsel]: And I'm not saying that. I just want to make the point that he wasn't here. . . . And that's something the jury should consider.
>
> [The Court]: I'll think about it. I think technically . . . you shouldn't be able to. But on the other hand, I understand . . . why you would want to say that.

¶52 The State argued to the court that though Braunreiter's testimony would be favorable to the State, he would not cooperate and testify. Further, the State asserted that Hardy could "criticize the state's evidence that was presented and say that there was not sufficient evidence to prove the charge without directly commenting on the witnesses that the state did or did not call. . . ." The State also stated that if the court allowed Hardy to

31

comment in closing on Braunreiter's absence, it should be allowed to explain why he was not called.

¶53     The court concluded that Hardy could not attribute the failure to produce Braunreiter to the State, so Hardy could not use Braunreiter's absence "to show that the state is not calling him because his testimony would conflict . . . with their charge." Hardy interjected to argue his belief that "the fact that [Braunreiter] didn't testify goes to the overall argument for proof beyond a reasonable doubt." The court responded that the issue was whether Braunreiter was qualified to testify. The court stated, "[Y]ou don't get to say, 'Where's Braunreiter? . . .' unless you can show the state could have called him, and that he would have testified." The court explained that if Braunreiter was not willing to testify under oath and instead wanted to make an outburst, he did not qualify as a witness. The court stated its belief that "that's why the state didn't call" Braunreiter, to which the State responded, "I think that was part of it, yes, Your Honor." The District Court concluded that "[a]t this stage," Hardy could not "comment on the state's failure to call" Braunreiter.

¶54     While settling jury instructions, Hardy explained that he was "still struggling with how [to] deal with John Braunreiter not testifying when he is the basis of count three. Again, I think I should be able to, at least, point that out to the jury, that he could have been called, and he wasn't." Finally, during Hardy's closing argument, he discussed Count III and the evidence underlying the solicitation charge. The following exchange took place:

> [Defense Counsel]: Count three is based on John Braunreiter. I drove to the prison to take Mr. Braunreiter's deposition. He refused to participate. He wouldn't even go under oath and talk to me.

[The State]: Your Honor, I object. This is –

[The Court]: That's sustained.

[Defense Counsel]: Where is Mr. Braunreiter in this trial?

[The State]: Object again, Your Honor.

[The Court]: That's sustained. The jury will disregard this.

Hardy again referred to Braunreiter's absence when arguing to the jury that the State did not meet its burden of proof on the two solicitation counts. Hardy argued that "based on these jailhouse informants with their serious character flaws, one of whom didn't even participate," the State "has completely failed to meet its burden on" Counts III and IV. The State did not object.

¶55    On appeal, Hardy argues that his right to present a complete defense and right to counsel were violated when the District Court prohibited him from arguing in closing about Braunreiter's absence at trial. Criminal defendants have a constitutional right to counsel and to "a meaningful opportunity to present a complete defense." *State v. Twardoski*, 2021 MT 179, ¶ 31, 405 Mont. 43, 491 P.3d 711. A "closing argument for the defense is a basic element of the adversary factfinding process in a criminal trial," therefore a defendant has a right to have his counsel "make a closing summation" that is "a proper argument on the evidence and the applicable law. . . ." *Herring v. New York*, 422 U.S. 853, 858, 860, 95 S. Ct. 2550, 2553-54 (1975). For the defendant, "closing argument is the last clear chance to persuade the trier of fact that there may be reasonable doubt. . . ." *Herring*, 422 U.S. at 862, 95 S. Ct. at 2554. While the complete denial of a closing argument violates the right

33

to counsel, the right is not "uncontrolled or even unrestrained." *Herring*, 422 U.S. at 862, 95 S. Ct. at 2554. Rather, it "is subject to reasonable restrictions." *United States v. Scheffer*, 523 U.S. 303, 308, 118 S. Ct. 1261, 1264 (1998). The trial court has broad discretion to control the duration and limit the scope of closing arguments. The court "may terminate argument when continuation would be repetitive," and "ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial." *Herring*, 422 U.S. at 862, 95 S. Ct. at 2554.

¶56 A party can generally comment on the opposing party's "absence of . . . or . . . failure to present evidence or other witness testimony to support his or her otherwise unsupported testimonial assertions at trial, opening statement assertions of fact . . . or an asserted . . . theory of the case." *State v. Miller*, 2022 MT 92, ¶ 28, 408 Mont. 316, 510 P.3d 17. *See State v. Makarchuk*, 2009 MT 82, ¶¶ 11, 22-26, 349 Mont. 507, 204 P.3d 1213 (permitting prosecutor's comments in closing criticizing defendant for failing to call particular witnesses and present phone records supporting his assertion that he made a relevant phone call). Here, the District Court exercised its discretion to ensure the orderly and fair nature of the proceeding when it limited Hardy's ability to argue the State failed to produce Braunreiter. Braunreiter clearly demonstrated his intent to disrupt proceedings and air grievances rather than testify under oath. Before the trial began, the court told Hardy and the State that it believed Braunreiter's threatened behavior on the witness stand would not be impacted by any admonishment regarding proper conduct while testifying. After the State decided not to call Braunreiter, the court concluded that his absence was not

34

attributable to the State since Braunreiter refused to cooperate as a witness and testify. The District Court concluded that Hardy could not comment in closing on the State's failure to call Braunreiter or show that the State did not call the witness because his testimony would be averse to the State's case. Accordingly, the court sustained the State's objection when defense counsel rhetorically asked the jury "Where is Mr. Braunreiter in this trial?" Notably, despite the District Court's ruling, Hardy was not entirely prohibited from arguing to the jury that the State failed to meet its burden of proof as to Count III by not calling Braunreiter. In defense counsel's closing argument, he told the jury that "based on these jailhouse informants with their serious character flaws, one of whom didn't even participate," the State "has completely failed to meet its burden on" Counts III and IV. There was no objection to this statement.

¶57    We conclude that, even assuming it was error to limit Hardy's ability to comment on the State's failure to call Braunreiter, any error was clearly harmless. Hardy argues the limitation on closing was structural error requiring automatic reversal. A structural error "is typically of constitutional dimensions, precedes the trial, and undermines the fairness of the entire trial proceeding," therefore it is presumptively prejudicial and automatically reversible. *State v. Van Kirk*, 2001 MT 184, ¶¶ 38-39, 306 Mont. 215, 32 P.3d 735. Examples of structural errors include the lack of an impartial judge, errors in selecting the jury, and a total deprivation of the right to counsel. *Van Kirk*, ¶ 39. Conversely, a trial error "typically occurs during the presentation of a case to the jury" and "is amenable to qualitative assessment by a reviewing court for prejudicial impact relative to the other

35

evidence introduced at trial." *Van Kirk*, ¶ 40. Such error is subject to harmless error review. *Van Kirk*, ¶ 40.

¶58 We have previously held the deprivation of a defendant's Sixth Amendment right to present a complete defense is a trial error subject to harmless error review. *See State v. Mercier*, 2021 MT 12, ¶ 31, 403 Mont. 34, 479 P.3d 967 (citing *United States v. Carter*, 907 F.3d 1199, 1210 (9th Cir. 2018)); *Crane v. Kentucky*, 476 U.S. 683, 691, 106 S. Ct. 2142, 2147 (1986) (concluding alleged violation of the right to present a complete defense is subject to harmless error analysis). In harmless error review, we examine the remaining evidence, considering "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, [and] the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points." *Mercier*, ¶ 31 (internal punctuation omitted; citations omitted). To determine whether an error was harmless, there must be "no reasonable possibility that the inadmissible evidence might have contributed to the conviction," looking to whether "the fact-finder was presented with admissible evidence that proved the same facts as the tainted evidence." *Van Kirk*, ¶ 47.

¶59 While the State discussed Braunreiter's testimony in opening and thereafter failed to call him as a witness, it presented the jury with admissible evidence that proved those same facts to which Braunreiter would have testified. In opening, the State told the jury Braunreiter said Hardy approached him soliciting him to kill Karen because she had to go, asked for $10,000 up front and another $10,000 after, and discussed that he would pay this amount through his sister by liquidating his assets. The State also said Braunreiter never

36

intended to kill Karen but intended to take Hardy's money to "use it to bond out of custody."

¶60    At trial, Orth testified that he overheard a conversation between Hardy and Braunreiter that took place in Braunreiter's jail cell on October 23, 2017. Orth testified that he walked in on the conversation where Hardy solicited Braunreiter to "hit" Karen or "take her out," and recalled that Hardy said he would pay Braunreiter $10,000, through Hardy's sister, and then another $10,000 when it was done. Orth also heard a second conversation with similar substance the next day where Hardy was negotiating with Braunreiter, offering to post Braunreiter's bond so he could get out of jail to kill Karen, and once again said he would pay Braunreiter $10,000 up front and another $10,000 after, through his sister. While Hardy did not use the word "kill," Orth testified that everyone knew a "hit" referred to murder, and that he "absolutely" believed Hardy was serious when he solicited Braunreiter to kill Karen. Orth further testified that he witnessed Hardy talking to Braunreiter about tracking down Hardy's friend in California to "beat[] him down for the money that he took from Hardy and finding out where his mom lives . . . and getting whatever's left in payment for the hit on Karen." On cross-examination, Orth admitted that at the suppression hearing, he had testified that he did not remember Hardy soliciting Braunreiter, but explained that he had a poor memory as a result of a brain injury and drug use, which is why he took notes about the interaction.

¶61    Detective Cochran then corroborated Orth's account that Hardy, "when talking about how he would get paid for murdering Karen, said that he gave his financial power or

37

power—his—the power of attorney to a family member." Detective Cochran testified that he found evidence of this financial arrangement while monitoring Hardy's incoming and outgoing mail at the jail. Detective Cochran also testified about notations Hardy wrote in his Bible that "death equals freedom" and "death to Karen" with an arrow drawn between the two phrases, and notations referring to Karen as a harlot. Detective Cochran also discussed drawings found in Hardy's cell indicating his desire to kill Karen. The drawings showed investigators, prosecutors, and witnesses in the case "Xed out in red" with "doomed" written over them. Another drawing showed Orth, Braunreiter, and Palmer as stick figures. One drawing had Charles's name on it, who was the friend Hardy referred to who had his money in California. Yet another drawing had Braunreiter, Orth, and Palmer in a cage. Some pictures had the words "false witnesses" written on them.

¶62    The State presented the jury with admissible evidence proving the same facts it asserted in opening. Further, the State presented evidence through Detective Cochran corroborating details about how Hardy's sister had power of attorney, the existence of Hardy's friend Charles in California, and Hardy's drawings in his Bible with implicit threats to Karen as well as Hardy's pictures showing witnesses with red Xs over them and the words "doomed" and "false witnesses." Given the evidence presented at trial that Hardy solicited Braunreiter to kill Karen, Braunreiter's refusal to testify under oath, Hardy's closing argument to the jury that the State failed to meet its burden of proof on Count III and reference to Braunreiter's absence, there is no reasonable possibility that the limitation on closing contributed to Hardy's convictions. Accordingly, we hold that any

38

error in limiting Hardy's ability to comment on Braunreiter's absence in closing argument was harmless.

¶63    *4. Should this Court exercise plain error review to consider whether Hardy's allegations of prosecutorial misconduct and other trial errors deprived him of a fair trial?*

¶64    Hardy contends that his convictions should be reversed because of the prosecution's misconduct throughout the trial and asks the Court to review this unpreserved issue under the plain error doctrine. Hardy alleges the following misconduct combined to render his trial fundamentally unfair: Repeatedly referring to Karen's inadmissible prior consistent statements; eliciting opinion testimony from a witness about Karen's credibility; improperly presenting prejudicial evidence of Hardy's bad character and uncharged misconduct; in closing, shifting the burden of proof by telling the jury each witness had to be lying for Hardy's story to be true; and paraphrasing Braunreiter's hearsay statements during opening without ultimately calling him to testify. Hardy also reasserts his arguments from Issues 2 and 3, above, that he was further prejudiced because he was unable to comment on Braunreiter's absence and the jury was not instructed to view the informants' testimony with caution.

¶65    Criminal defendants have a right to a fair trial under the Sixth Amendment of the United States Constitution and Article II, Section 24, of the Montana Constitution. We generally do not address issues of prosecutorial misconduct pertaining to a prosecutor's statements not objected to at trial. *State v. Aker*, 2013 MT 253, ¶ 21, 371 Mont. 491, 310 P.3d 506. We may discretionarily review unpreserved errors that implicate a criminal

39

defendant's fundamental constitutional rights under plain error review. *State v. Valenzuela*, 2021 MT 244, ¶ 10, 405 Mont. 409, 495 P.3d 1061. We exercise plain error review when failing to review the claimed error may result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the trial or proceedings, or compromise the integrity of the judicial process. *Valenzuela*, ¶ 7 (citation omitted). Plain error review is exercised sparingly, on a case-by-case basis, and only in this narrow class of cases. *State v. Lackman*, 2017 MT 127, ¶ 9, 387 Mont. 459, 395 P.3d 477.

¶66 A prosecutor's misconduct may be grounds for reversing a conviction and granting a new trial if it deprives the defendant of a fair and impartial trial. *State v. Hayden*, 2008 MT 274, ¶ 27, 345 Mont. 252, 190 P.3d 1091 (citations omitted). However, we will not presume prejudice from the alleged misconduct; rather, the defendant must demonstrate that the alleged misconduct violated his substantial rights. *State v. Christensen*, 2020 MT 237, ¶ 79, 401 Mont. 247, 472 P.3d 622. Moreover, we do not isolate the challenged comments on review but consider the challenged comments in the context of the trial and the closing argument as a whole. *Christensen*, ¶ 79. Where multiple claimed errors are "committed by the prosecutor, the cumulative effect of the misconduct leaves unsettled the question of the fundamental fairness of the proceedings." *State v. Byrne*, 2021 MT 238, ¶ 32, 405 Mont. 352, 495 P.3d 440 (citation omitted). Under the cumulative error doctrine, we will reverse a conviction if numerous errors, taken together, have prejudiced a defendant's right to a fair jury trial. *State v. Smith*, 2020 MT 304, ¶ 16, 402 Mont. 206, 476 P.3d 1178.

¶67 Prior to trial, the District Court granted Hardy's motion in limine excluding certain evidence pursuant to M. R. Evid. 402-404 as irrelevant, unduly prejudicial, or inadmissible uncharged conduct offered for propensity purposes. Hardy argues that the prosecutor violated this order by presenting evidence that Hardy: 1) owned an assault rifle, 2) was suspected of sexually assaulting someone, and 3) had an arrest warrant for a felony assault or weapon charge. Hardy argues that this evidence bolstered the view of Hardy as a having a "David Koresh" type character for violence. However, as Hardy acknowledges, a photo of the assault rifle was inadvertently published "for a few seconds" during a presentation of crime scene photos. As to the sexual assault, the prosecutor asked a serologist to summarize a report completed for the State and the serologist briefly mentioned a sexual assault examination kit among a list of items he analyzed. This brief reference did not tie the sexual assault kit to Hardy or Z.H., and there was no further testimony on the subject. Regarding the arrest warrant, a photo of a letter denying Hardy's passport application because of the outstanding arrest warrant was admitted on one of ten disks containing various documents, and there is no indication the photo was ever displayed to the jury. To the extent each of these three incidents constituted a violation of the District Court's order, they were brief, unspecific, and harmless.

¶68 Hardy also argues that the prosecutor improperly elicited testimony from Officer Tyler Kammerzell vouching for Karen's credibility. The prosecutor questioned Officer Kammerzell about Karen's demeanor while being interviewed. Officer Kammerzell responded by describing her demeanor then adding, "[t]hroughout the entire account of the

41

interview, she seemed very specific and detailed to the point where she was believable to us." Witnesses "may not comment on the credibility of another witness's testimony, nor can a prosecutor elicit such testimony." *Byrne*, ¶ 23 (quoting *Hayden*, ¶¶ 26, 31). We have held the admission of opinion evidence on a witness's credibility to be plain error when a prosecutor elicited testimony from a witness on the credibility of two other witnesses, including directly asking whether the witness believed they were telling the truth, and then improperly offered his own opinion that the witnesses were believable and reliable during closing arguments. *Hayden*, ¶¶ 31-32. Here, as the State admits, the statement that Karen "was believable" was an improper comment on Karen's credibility. But unlike in *Hayden*, the comment was the sole instance of a witness improperly vouching for Karen's credibility throughout the trial, and the prosecutor's question and the remainder of Officer Kammerzell's response were proper. This singular comment did not improperly invade the province of the jury. *See Byrne*, ¶ 32 (noting the case did "not involve one isolated improper vouching statement by one witness or one improper vouching comment during closing argument").

¶69    Hardy next asserts the prosecutor improperly diluted and shifted the burden of proof during closing by stating to the jury that:

> And besides which it's not just Karen that has to be making this up for the defendant's story to be true. Imagine what else has to be true.

> Everyone that has ever talked about what the defendant said or did would have to be lying.

Hardy argues the prosecutor told the jury it could acquit Hardy only if it found all the State's witnesses lied under oath. Hardy argues the prosecutor's comment told the jury to ask whether Hardy's account was true rather than whether there was reasonable doubt as to Hardy's guilt, thereby shifting the State's burden of proof to Hardy to prove an alternative theory of the case. The State responds that the prosecutor's statement "was an exaggeration," and that the prosecutor was making an argument about the significant amount of evidence corroborating Karen's account.

¶70 While the prosecutor incorrectly stated all the witnesses would have to be lying, we agree that in context, the argument was about the overwhelming amount of evidence corroborating Karen's story. The prosecutor went on to state:

> [E]very piece of forensic evidence would also have to be wrong.
>
> The human remains just magically appeared on the defendant's property. The cadaver dogs detected human decomposition for no reason. The bullet, in the wall, just a coincidence. Someone put Korjack's blood on the TV. The shell casing in the fire pit. The burned box springs. The defendant's immediate theft and cash influx. The defendant's notes about killing Karen. Admitting his motive for killing them – for killing Korjack and Orozco to Karen.
>
> The defendant wants you to throw all that out. . . . [This is] the desperate defense of a desperate man in the face of *overwhelming evidence to the contrary*.

(Emphasis added.) Further, the jurors are presumed to have followed the repeated instructions given to them regarding the State's burden of proof. *See State v. Smith*, 2021 MT 148, ¶ 49, 404 Mont. 245, 488 P.3d 531 ("We presume the jury followed . . .

43

instructions."). Accordingly, we do not find the prosecutor's comment improperly shifted the burden of proof.

¶71 Finally, Hardy argues that the State improperly and repeatedly presented Karen's prior consistent statements during the trial. In opening, the prosecutor told the jury what the State's witnesses had said to law enforcement during the investigation, rather than stating what evidence she expected to introduce. *See State ex rel. Fitzgerald v. Eighth Jud. Dist. Ct.*, 217 Mont. 106, 121-22, 703 P.2d 148, 158 (1985) (in opening, "counsel may briefly state his or her case and the evidence he or she expects to introduce to support the same . . . if those statements are made in good faith and with reasonable ground to believe the evidence is admissible"). Hardy argues the prosecutor therefore repeated in opening what she anticipated would be prior consistent statements of the witnesses. Next, Hardy argues the prosecutor elicited Karen's prior consistent statements while questioning Officer Kammerzell, during which the following exchange took place:

> Q: Did you talk to [Karen] about specifically why she thought she needed to be in witness protection?

> A: Yeah. Earlier . . . she had stated that she believed that she saw the defendant in the Sidney area, and it was her belief that he was trying to kill her or harm her or her family members.

Defense counsel objected on hearsay grounds, and the District Court overruled the objection, telling the jury that the statement was being offered for the purpose of determining "whether it's consistent with [Karen's] earlier testimony." In another instance, Officer Kammerzell testified that when Karen reported the homicides to him, she asked

about the Witness Protection Program, which prompted a hearsay objection overruled by the District Court.

¶72 Similarly, the prosecutor asked Detective Cochran on direct examination whether Karen's testimony "comport[ed] with the kind of things she told you in the [2016] interview," since Detective Cochran "heard Karen testify here, in this courtroom, as [he] was sitting on the bench." Detective Cochran responded that it did. Then, the prosecutor asked Detective Cochran a series of questions about whether his investigation corroborated specific aspects of her report. Hardy argues that the prosecutor "essentially personally testified regarding" Karen's account to Detective Cochran by repeatedly paraphrasing portions of her interviews during his direct examination and asking the detective if his investigation "corroborate[d] that report," bore out her statements to the police, produced evidence to support those statements, or indicated her hearsay statements were "true." For example, the following exchange took place:

> Q: Karen told you that, when the defendant started shooting in the room, that bullets struck everywhere in the room. Did you find any evidence of bullets being fired in that room?

> A: We did locate a bullet behind drywall in the room.

¶73 Hardy argues that by repeating Karen's prior consistent statements in opening and during the direct examination of Officer Kammerzell and Detective Cochran, and by asking Detective Cochran whether Karen's report was consistent with her trial testimony, the prosecution improperly bolstered Karen's testimony—the only eyewitness to the homicides. The statements told the jury Karen had told the same story previously, making

45

it more likely jurors would assume her account was trustworthy. As Hardy argues, this constituted prosecutorial misconduct since a prosecutor "should not bring to the attention of the jury matters that the prosecutor knows to be inadmissible, whether by offering or displaying inadmissible evidence, asking legally objectionable questions, or making impermissible comments or arguments." *State v. Krause*, 2021 MT 24, ¶ 26, 403 Mont. 105, 480 P.3d 222 (quotation marks omitted; citation omitted).

¶74 According to Hardy, the impact of these statements rendered the trial fundamentally unfair since the State's case relied heavily on Karen's eyewitness testimony. However, Hardy has not shown that failing to review the claimed instances of prosecutorial misconduct would call into question the fundamental fairness of the proceedings. While Karen was the only eyewitness to the homicides, her testimony was corroborated by numerous other witnesses and forensic evidence. Multiple neighbors testified that after the spring of 2013, they only saw Hardy and Z.H. around the Frenchtown home. They also noted a horrible smell emanating from a fire on Hardy's property that lasted roughly a week. One neighbor described it like the smell from a burning deer carcass. A neighbor discussed seeing deadbolts on the doors in the house, bars over the windows, and Hardy excavating his property at night. They also noted Hardy purchased cars, snowplow equipment, and other big items, but that the spending spree stopped a few years later, at which point Hardy complained he had no money. Acquaintances of Hardy's were hired to work on the property in the summer of 2013. There was testimony that carpet and sheetrock was removed and piled in the basement and paperwork with other names,

including Orozco's, was thrown out. An acquaintance testified that he took items to a pile to be burned, but Hardy did not want him to go near the fire pit. Contractors hired to pour concrete that summer were paid in cash and saw a woman on the property, likely Karen. Another person hired to do work in 2013 testified that Karen told him she did not want to stay there, and that Hardy told him he had a friend who stole more than $100,000 from him. Hardy then asked if he wanted to go to California with him to kill that friend and get the money. Hardy offered to split the money with him.

¶75 McKinley corroborated Karen's account of living with him for a few months and described Karen's demeanor as that of a person with PTSD. He noted that Karen talked about missing Orozco. Hardy's cousin Rhonda, who he calls his sister, testified that in 2013 Hardy repaid $1,500 that he owed her. Hardy flew Rhonda twice to Missoula in 2013, and on the second visit, Karen and R.J. were at the house. Rhonda testified that Karen placed a letter in her luggage saying that Hardy was the reason Orozco was absent, but she did not believe the letter. A woman in Wyoming testified that she had arranged in 2012 to buy a trailer from Korjack, but that later Hardy called her and asked that she make payments to him instead of Korjack.

¶76 There was no evidence that Korjack or Orozco were alive after March 2013, including multiple witnesses who testified that they never heard from either man again. Orozco's and Korjack's mail was sent to a P.O. box that Hardy collected mail from. The key was found at Hardy's home. The P.O. box was renewed in August 2016 using typed checks from Korjack's bank account signed with a signature similar to a stamp found at

47

Hardy's home. Korjack had multiple bank accounts which he did not access after March of 2013. Korjack's bank records also corroborated Karen's testimony that Korjack had been removing money from his accounts leading up to March of 2013, and that he purchased over $100,000 in gold and silver at that time. On March 26, 2013, Korjack withdrew over $100,000 in a cashier's check which was found in Hardy's home uncashed. One of Korjack's bank accounts had no activity between 2013 and July 2016, at which time the bank issued new cards and checks to Korjack. After that, the bank account became active again. The bank deactivated the account after learning it might be fraudulent. A person claiming to be Korjack's nephew presented Korjack's passport to a bank teller and asked to update the account for Korjack. That passport was found in a safe in Hardy's home. Further, Walmart surveillance video captured Hardy using Korjack's debit card from another bank account.

¶77 Receipts corroborated Karen's testimony that Hardy purchased a new window in March of 2013, and glass fragments were found outside the bedroom window. During the investigation, officers found a bullet behind the basement bedroom's drywall, the gun that fired that bullet, and a safe that had been cut open. Dogs trained to alert to human decomposition alerted on one area of the property, and one dog was interested in a white truck on the property. Swabs were taken from that white truck that tested positive for blood.

¶78 Bone fragments were found in the fire pit along with a shell casing, and a burned mattress and box springs were located near the fire pit. Bones found during the first search

of the home were identified as human. After a search warrant was issued, a second search of the burn pit was completed using a smaller screen to go through the material. Three jaw bones, several teeth, and other assorted bone fragments were found. An anthropologist testified that these bones came from at least two individuals.

¶79 Officers seized a television during another search after Hope, one of the jailhouse informants, learned from Hardy that a television with blood was still at the house. The blood on the television was tested and was determined to have a high likelihood of being Korjack's blood, corroborating Hope's information. Additionally, the three jailhouse informants testified to numerous incriminating statements, admissions, confessions, and actions of Hardy's while he was incarcerated, including that Hardy said he moved the bodies in a white pickup truck and committed the homicides with the same caliber handgun found by law enforcement at Hardy's home. Orth and Palmer also testified in detail regarding Hardy's solicitation attempts.

¶80 Given the overwhelming evidence corroborating the homicides, solicitation attempts, and Karen's eyewitness account, Hardy has not shown that the claimed instances of prosecutorial misconduct rendered his trial fundamentally unfair, whether viewed individually or cumulatively. Reviewing the trial record as a whole, we conclude that Hardy has not demonstrated that failing to address the claimed errors would result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the trial, or compromise the integrity of the judicial process. Accordingly, we decline to exercise plain error review of Hardy's claims.

**CONCLUSION**

¶81 The State's use of jailhouse informants did not violate Hardy's right to counsel. The jury was fully and fairly instructed on the applicable law pertaining to witness credibility. The District Court did not violate Hardy's rights to counsel and to present a defense when it prevented defense counsel from commenting on a missing prosecution witness during closing argument. Lastly, this Court will not exercise plain error review to consider whether Hardy's allegations of prosecutorial misconduct and other trial errors deprived him of a fair trial.

¶82 Hardy's convictions are affirmed.

/S/ LAURIE McKINNON

We concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR
/S/ JIM RICE